## Case No. 4,814.

**FISHER v. BOODY et al.**

[1 Curt. 206.] [1]

Circuit Court, D. Maine.   Sept. Term, 1852.

---

[1] [Reported by Hon. B. R. Curtis, Circuit Justice.]

CURTIS, Circuit Justice. This is a bill in equity, filed by David A. Fisher, a citizen of Massachusetts, against Henry H. Boody, Freeman Bradford, and Joseph Russell, citizens of Maine, to set aside a sale and conveyance of land, on the ground of fraud. The material allegations of the bill, upon which the claim to relief is rested, are, that the defendants, claiming to be the owners of a tract of land in the state of Maine, containing six thousand six hundred and ninety-four acres, known as the 'Bog Brook Tract,' authorized one Nathaniel Miller to make sale of it; that, on the seventh day of August, 1835, the complainant contracted with Miller to purchase one undivided eighth part thereof, at the rate of $4.50 per acre; that, at or near the same time, other persons purchased five undivided eighth parts of the same land; that the complainant received from two of the defendants, Bradford and Russell, a written contract to convey to him what he thus purchased, and paid to them in cash the sum of $1,255.12, and executed three promissory notes for the sum of $836.67 each, one payable in one year, one in two years, and one in three years from the seventh day of August, 1835, and on the ninth day of November, 1835, received the deed of the defendants, purporting to convey to him, in fee-simple, one undivided eighth part of the land; that the defendant paid, at its maturity, the first of his notes, but the others are outstanding. The bill

further states, that Miller applied to him, in Boston, to purchase, representing that there were some gentlemen there from Maine, who had a choice piece of timber land, which they offered to sell at a great bargain; that he intended to take part of it, and wished the complainant to take a share, and was desirous of making up a company of his friends, that they might operate on the land, get off timber from year to year, and make a great profit; that Miller exhibited a plan of the land, and stated that the lumber cut therefrom would come to navigation the first season; that, on the complainant's declining to purchase, he induced him to see one Borland, who, he said, had explored the land; and Borland informed the complainant that he had explored it, and found it one of the best tracts of timber land in Maine; that it would yield from four to six thousand feet of choice pine timber per acre, and other timber, such as spruce, juniper, and cedar, to make it average ten thousand feet per acre, and possessed all the advantages of locality and streams to enable those who purchased it to float the timber to market the first season after being cut; that it was a great bargain at $5.50 per acre, and if it could be had at that price, he, Borland, was determined to go into it, to the extent of his ability. That the complainant still declining to purchase, Miller afterwards brought to him a person named Fogg; represented that Fogg had been sent down to explore the land, and he wished the complainant to hear his statement concerning it; whereupon Fogg stated, that the land would average from three and a half to four and a half thousand feet of choice pine timber per acre, and other timber in proportion; that the advantages for getting out lumber were good, and that timber cut therefrom could be floated down to a market the first season.

The bill charges that the land was of no value whatever as timber land, or for the purpose of lumbering, because about all the pine trees of sufficient size to be sawed into boards were wholly unsound and rotten, so much so, that the same could not be got out and manufactured into boards and sold at a sufficient price to pay the expense of the operation, and that this was known to the defendants; that when the defendants contracted to sell, they did not own the land, but only had a right to purchase it at not more than $1.50 the acre, and they knew it was not worth even that price, and obtained this right to buy merely with a view of defrauding some unsuspecting person.

It further charges, that one Lewis L. Miller, having been authorized by the defendants to sell the land, applied to one Cheeseborough to purchase, and they having agreed to have it explored, Miller selected Fogg, and Cheeseborough selected Borland, and sent them down to the land on that business; that Borland and Fogg,

in July, 1835, went on to the land, in company with the defendants, Bradford and Russell, and found it wholly worthless for purposes of lumbering; that the defendants, knowing that Borland and Fogg would so report, while coming from Portland to Boston with them in a steamboat, offered to each of them a deed of one undivided eighth part of the land, or a part of the profits, if they would report that the land was well covered with valuable timber, and was a great bargain at $4.50 per acre, and if they would aid and assist in working off a part, or the whole, of the land at that price; that Borland and Fogg agreed to the proposal, Borland, however, reserving the right to acquaint Cheeseborough, secretly, of the worthlessness of the land, which he did, on seeing Cheeseborough; that the defendants gave Fogg a written promise to perform their nefarious contract, and that Borland and Fogg did report, falsely, to Miller, that they had found the land valuable, that it contained a large quantity of choice pine timber, and other valuable timber, and was a great bargain at $4.50 per acre.

The bill further states, that when Borland and Fogg made the above-mentioned representations to the complainant, they were under the corrupt contract aforesaid, with the defendants; and that the complainant, being deluded and influenced by the false and delusive declarations and representations made by Nathaniel Miller, Borland, and Fogg, did, on the same day, conclude a bargain, as above-mentioned. There is another charge in the bill, concerning an incumbrance on the land, which will be noticed hereafter.

This is a succinct statement of the substance of the case made by the bill; and as there can be no doubt a sufficient case is stated, the first inquiry must be, whether it is made out in proof.

It should be observed, at the outset, that the bill does not aver that either of the defendants, in person, made any misrepresentation; the charge is, that the false representations, which misled the complainant, were made through Nathaniel Miller, Borland, and Fogg. We have, therefore, to ascertain from the evidence, not only what each of these persons represented to the complainant prior to his purchase, but also, whether at the times of such representations, each was so connected with the defendants as to render the defendants responsible for his acts in respect to this land. It has been urged, that if a third person, wholly unconnected with the defendants, made fraudulent representations, which induced the complainant to purchase, he is entitled to relief. I will not say a case for relief might not be made, resting on such a basis; but it must be on the ground of mistake, and must be brought within the principles applicable to that head of equity. There can be no responsibility for the fraud of a mere third person, acting without any authority from the defendants. And this bill states no case of mistake. It is true, that in summing up the grounds for rescinding the sale, this language occurs: "And although such gross and palpable fraud has been committed and practised upon your orator, or such gross and palpable mistakes mutually made and committed in regard to the value of said land and timber." But there is nothing in the bill to which these words concerning mistakes can be referred. No mutual mistake is anywhere described, and the averments throughout are of positive and intentional fraud and deception. I assent to the rule laid down by the lord chancellor, in Price v. Berrington, 7 Eng. Law & Eq. 254, that when a bill sets up a case of actual fraud, and makes that the ground of prayer for relief, the plaintiff is not entitled to a decree by establishing some one or more of the facts, quite independent of the fraud, which might of themselves create a case under a distinct head of equity. I return, therefore, to the inquiry, whether Nathaniel Miller, Borland, or Fogg, made to the plaintiff, before the purchase, the representations charged in the bill; and if so, whether he was so connected with the defendants, or either of them, as to give a title to relief on the ground of fraud.

And first, as to Nathaniel Miller. The only evidence of representations made by him comes from himself, as a witness for the plaintiff; and he fails to prove that he made the representations alleged in the bill. He admits that he urged the plaintiff to buy, told him he intended to purchase, and that he and some of his friends, who were to purchase the other parts of these lands, would join the defendant in operating, that is, getting off the timber. But he does not remember telling him it was a choice piece of timber land, or that it was a great bargain, or that great profits could be made. In short, he proves no material representation charged in the bill, even of the most general character, which was not true. It was urged by the plaintiff's counsel, that as he declares he said as much to the plaintiff as he did to others, and it is proved he made some more specific representations to others, and as it is apparent that, from the age of the witness and the lapse of time since the occurrences, his memory was not clear, the court should presume that he did make to the plaintiff, the declarations charged in the bill. But having been carefully interrogated, by a set of very pointed, not to say very leading questions, upon each representation alleged in the bill, and having declared that he did not remember making them, it would be exceedingly dangerous to assume that his subsequent loose statement, that he said as much to the plaintiff as to others, is evidence that he made to the plaintiff the representations

charged in the bill. If his memory was not sufficient to enable him to say whether he did or did not make those representations, it was not sufficient to enable him to prove the fact that he made them; and how much he said to others, is quite immaterial.

There is some ground laid by the bill for the inquiry, whether the plaintiff was not influenced by the belief that Miller was to pay, for his eighth of the land, as much as the plaintiff; but I am spared the necessity of investigating this, by the disclaimer of the plaintiff's counsel of all intention to impute to Doctor Miller, any intentional concealment of the fact, that a discount was to be made to him, and by the frank admission, which, indeed, Miller's testimony seems to render necessary, that his client has nothing to complain of in this particular.

I proceed, therefore, to examine, what relation Borland bore to these plaintiffs, at the time when the interview took place between him and the plaintiff and Miller, on the seventh day of August. This was the only interview with Borland, before the plaintiff's purchase, which was concluded on that day. The bill charges, that Borland and Fogg, having been sent to explore these lands by Miller and Cheeseborough, who proposed to purchase them, were bribed by the defendants to make a false report to their employers, and to aid in selling the lands, by making misrepresentations. The answer of each defendant explicitly denies this charge and all connection with Borland, at any time prior to the thirteenth day of August; and they deny that Borland then had any agency for them, or either of them; but they admit that Russell and Bradford then agreed, that if he and his friends should take up the residue of the land, which Miller and his friends should not buy, at the rate of $4.50 the acre, they would give him one eighth of the land. So far as respects the denial of the bribery of Borland and Fogg, by the defendants, to make a false report to their employers, the answers are supported by the testimony of Fogg, taken by the plaintiff, who swears he knew nothing of it, and, so far as he was concerned, it was not true; and this very grave charge is not supported by any proof; nor is there evidence of any relation whatever between Borland and the defendants, prior to the time when the plaintiff made his purchase. That before the interview between himself and the plaintiff, Borland intended to have some connection with the sale of these lands, and hoped, as he declared, to make something out of it, is highly probable. That these plaintiffs had in any way employed him in reference thereto, before the plaintiff made his purchase, or knew that he had busied himself about the sale, or were at any time informed that he had made any representations to the plaintiff, does not appear. In respect to Fogg, the principal evidence in the cause comes from himself; he having been examined as a witness on the part of the plaintiff. His testimony, while it negatives, decidedly, any fraudulent purpose on the part either of himself or of any of the defendants, does clearly prove an employment, by Bradford, to give information to the plaintiff and others concerning these lands. And it shows, at the same time, a direct interest to promote the sale to the extent of one thousand dollars, which he was to receive, in case the sale should be effected for the price of $4.50 the acre. He says there was a written contract between himself and Bradford and Russell to this effect, the manner of obtaining which he thus describes: "I invited Bradford, on the day of the date of the obligation, to walk with me; he talked on various subjects. I told him I expected he was making a great deal of money by this bargain, and I would stay, till it was decided whether they sold, if he would give me $1,000. I told him I could say nothing more in praise of the land than I had already said; but I could blow up the bargain, and would, unless they gave me an obligation for $1,000." A copy of an obligation to Fogg, signed by the defendants, Bradford and Russell, is put into the case by the plaintiff; but it purports to relate to a tract of land materially different in quantity from the one in question, not identified with it by any certain description, and the answers of Bradford and Russell, which in this respect are responsive to the bill, aver that it does not relate to this land. I do not pause upon this; my present purpose being to declare how far there was an employment of Fogg, in behalf of the defendants, or any of them, in reference to these lands, so as to make them responsible for his representations. Nathaniel Miller testifies that Fogg told the plaintiff the land had from three and a half to four and a half thousands of good pine, per acre. Fogg himself declares he made no representation he did not believe to be true; that he gave a correct account of the land, as near as he had been able to learn; that he considered the land a bargain at the price asked; and that he had made his report, and told all he knew about the land, before he was employed by the vendor.

It is necessary, to a correct understanding of the case, to state that the gravamen of the plaintiff's complaint does not respect either the soil, or local position, or even the quantity of timber on the land; but its quality. As to the quantity of timber, though there is some conflict of opinion among the practical lumbermen who have worked on the tract, yet the general result of the evidence is, that the quantity was large; and the plaintiff's counsel explicitly declared, at the bar, that he did not make a question on that point; and the bill states, in terms, that it was the unsound and rotten condition of the pine timber which rendered the land of no value; and that it was in that particular the plaintiff was and continued to be deceived, even for the space of two years after he

made his purchase. Indeed, it is only upon this ground the bill can stand, because during the years 1835–36, and 1836–37, the plaintiff and his associates had sufficient means of knowledge of the quantity of timber, and the bill alleges no concealment by the defendants in this particular; and as the plaintiff and his associates continued to operate on the land during both those seasons, and this bill was not filed until August, 1844, it would be impossible to maintain the suit upon the ground of a deficiency in the quantity of timber. The real cause of complaint is, that the quantity of sound merchantable pine timber was not equal to what was represented. Upon this point, the testimony of Miller and Fogg, taken together, is, that Fogg represented there was from three and a half to four and a half thousand of good pine per acre, and that he believed what he said to be true. In point of fact, I think the evidence shows this representation was not substantially correct; a considerable part of the pine timber then standing on the land being more or less decayed. But it is a very material inquiry here, whether this assertion by Fogg was of a matter of fact, or a matter of opinion merely. An honest but mistaken assertion of a fact, to another's loss and his own gain, by a vendor or his agent, may be a constructive fraud; but this principle does not extend to assertions of what are known to both parties to be matters of opinion only. And an assertion may appear to be a matter of opinion, either from its being made in that form, or from the very nature of the thing asserted. It is shown, by the evidence in this case, and I think is so obvious, that it must be taken to have been known to the plaintiff, that a representation of the quantity of sound pine timber standing on the land, was of a matter of opinion. Many persons, of practical experience in such matters, and better acquainted with these lands than one merely sent to make an exploration could be supposed to be, have testified in this cause on this subject. They differ very widely. The result may be summed up in the words of one of the witnesses, who says some lumbermen thought the best and most valuable timber had been cut, and others thought differently. The very representation relied on showed it to be somewhat loose and conjectural; three and a half to four and a half thousand feet per acre, does not convey the idea of a precise statement of a matter of fact. According to the bill, the plaintiff had just before been told by the other explorer, Borland, that the land would yield from four to six thousand feet of choice pine per acre. Such a wide discrepancy between the two persons employed to explore, and to whom the plaintiff resorted for information, must at least have apprised him that they were speaking from loose estimates. It must be observed, that the assertion relates to the quantity of sound timber. This involves, not merely the question how much pine tim-

ber was on the land, but what part was sound, and what unsound. The latter is very difficult to be determined, with any approach towards precision, by a mere exploration of the land. No doubt, some estimate may be formed; but the nature of the thing, as well as the very considerable discrepancies among the witnesses, show it to be purely a matter of opinion, upon which honest and skilful men will greatly differ.

I have examined the substantial allegations in the bill respecting the misrepresentations relied on, in order to see what their character was; whether they are supported by the proofs, and how far the defendants are responsible therefor. There are many allegations concerning the representations made to others, which are material only as tending to show, if proved, a general fraudulent purpose on the part of one or more of the defendants, and of Borland. But inasmuch as no representations by the defendants themselves are alleged, and as Borland is not shown to have been their agent, or to have been in any way connected with them before the plaintiff purchased, I have not thought it necessary to detail them. There are also circumstances in the case tending to show, that some of these transactions, with others than the plaintiff, were not conducted fairly by all who were concerned in them. It is very extraordinary that one eighth of the whole tract should have been given to Borland. It is not quite clear to my mind, that the promise to Fogg referred to the sale of another tract of land; it is proved, I think, that Borland deluded some of the other parties; but the great difficulty in the plaintiff's case is, that he does not connect himself with these circumstances, and show himself to have been deluded into making this purchase, by such evidence as will enable me to set aside this conveyance after the lapse of so much time, and after the acquiescence by him which appears; all fraud being explicitly denied by the answers.

This sale was made in August, 1835, and nine years elapsed before the bill was filed. It is true, no statute of limitations is pleaded, and the lapse of time is not specifically relied on in the answer. But I apprehend the true doctrine on this subject is given by Lord Brougham, in Irvine v. Kirkpatrick, 3 Eng. Law & Eq. 24, decided in the house of lords in 1851. "A party, say they, meaning to avail himself of the topic of time, must do it by a plea, and must succeed altogether, or, I suppose they mean to add, fail altogether. I cannot go so far as that. I, too, say that a court of equity will overleap the barrier of time to get at the fraudulent practice. I, too, say the length of time which has elapsed is not a bar to this suit. But that it should not enter into our consideration; that it is to be wholly dismissed; that as a suggestion, it is to have no effect in moulding, as it were, in influencing the frame of mind, in which we shall be when we are to consider the

rest of the case, either as a jury upon the facts, or as judges upon the law,—to that proposition I cannot assent. Am I to dismiss that fact from my mind, and deal dryly with all the facts and all the law of this case exactly as if it had occurred three or four years, or as many months before the action was brought? I cannot go that length. On the contrary, I hold it is most material," &c.

This distinction, between a positive bar from lapse of time, and that lying by and acquiescence, which will cause a court of equity to look upon the proofs with some distrust, and to refuse relief unless the delay and acquiescence are satisfactorily accounted for, I consider a most important principle, necessary to be constantly kept in view in wielding the transcendent powers of a court of equity; and it rests upon ample authority, though, in my judgment, it has sometimes not been sufficiently regarded. Prevost v. Gratz, 6 Wheat. [19 U. S.] 481; Elmendorf v. Taylor, 10 Wheat. [23 U. S.] 153; Piatt v. Vattier, 9 Pet. [34 U. S.] 416; Stearns v. Page [Case No. 13,339]; Wagner v. Baird, 7 How. [48 U. S.] 234; 1 Madd. 99; Lawrence v. Blake, 8 Clark & F. 504; Hough v. Richardson [Case No. 6,722]. The plaintiff seems to have been quite aware of this difficulty, and has introduced into his bill some allegations designed to avoid it. Their substance is, that by the fraudulent practices of some of the defendants, and of other persons having a common interest with them, the plaintiff and his associates were prevented from discovering the decayed state of the timber until the summer of 1837; and the bill avers, "that he made no discovery of the frauds practised upon him until the fifth day of January, 1839; at which time your orator first discovered and was satisfied, and felt himself able to prove, the many charges set forth in this, his bill of complaint, and has to this time delayed prosecuting the same on account of the poverty the said frauds of the defendants brought upon him, and the hope that his appeals to their justice and equity would save him from the vexation, trouble, and expense of an appeal to this court for redress." This, taken in connection with the facts in the cause, is far from being satisfactory to my mind. It appears that, in the summer of 1837, a large quantity of this timber, taken from the land during the two preceding years by the plaintiff and his associates, was actually sawed into boards; and it is the result of that operation which is now relied on, as showing the worthlessness of the timber. If the plaintiff did not then know that its quality fell so far short of the representations, as to amount to a fraud, he was either guilty of gross neglect, or there was not such a fraud as he relies on. In respect to his first feeling himself able to prove all his charges of fraud in January, 1839, no particular sources of evidence, then first discovered, being in any way indicated by the bill, or appearing in the proof, I can allow no weight to it. Such vague allegations are too easily made to be entitled to any effect. If, at that time, the plaintiff made any particular discovery, the bill should have stated what it was, and why it was not before known, and how it was discovered. Stearns v. Page, 7 How. [48 U. S.] 829. That the delay has arisen from the poverty of the plaintiff, brought upon him by the frauds of the defendants, is not shown. He has paid the plaintiffs less than twenty-two hundred dollars; it does not appear that he lost any considerable sum in the lumbering operations; the evidence tends to show that, in 1835, he was worth about ten thousand dollars, and that he was engaged in other eastern land speculations. His letter to the plaintiff, Boody, written in January, 1838, though it shows he was in want of money, does not indicate poverty; and there is no evidence that this pretence in the bill is well founded. It is not by a statement of imaginary difficulties, or unreal obstacles, that delay is to be accounted for. In this case, I am not satisfied that any thing more substantial is shown.

But this case contains facts still more formidable to the plaintiff's claim than mere delay. From 1837 down to the filing of the bill, lumbering operations have been carried on upon these lands by practical lumbermen, and so large quantities of timber removed, as to affect very materially the value of the land. During this time it has also been injured by fire. In January, 1838, after the timber, taken off by the plaintiff and his associates, had been actually sawed into boards, the plaintiff wrote a long letter to Boody, in which he recognizes his notes as due, and gives assurances of their being paid. And though he does not appear to have been concerned in the profits of the subsequent operation on the land, yet, as late as 1840, he offered to Purrington, one of the witnesses, a permit to cut timber thereon. Here is an amount and kind of acquiescence, and a consequent change in the value of the property, which render the court, through the fault of the plaintiff, unable to restore the parties to their original condition.

There is one other part of the bill which must be adverted to. It is the claim for relief, by reason of an incumbrance on that part of the land purchased of Russell. There can be no doubt that a fraudulent concealment of incumbrances on the land sold may lay the foundation for relief, by a rescission of the sale, even after the execution of a deed of conveyance containing covenants, upon which a remedy might be had at law. But I apprehend that a very different case from the present must be made. The answer of Russell admits that the land was represented, at the time of the sale, to be unincumbered, and that it was his intention to have had an unincumbered

title made by the holder of that title; but that the plaintiff, with a full knowledge of the state of the title, proposed to accept a deed from him, and to rely on his removing the incumbrance, which he afterwards did, by paying it off, and taking a discharge of the mortgage. There is nothing in the proofs sufficient to control this; and it is in part, supported by the record evidence. The plaintiff has not suffered any loss, by reason of the existence of the mortgage; nor does he show that he is now exposed to any. I cannot, for this cause, set aside a conveyance made seventeen years ago.

I have not adverted particularly to some more general grounds of complaint contained in the bill. It is certainly true that the defendants were not the owners of the land when the sale was made, having only a right to purchase it on certain terms. It is true, also, that the price at which they sold, was at a very large advance upon that which they were to pay. I am satisfied that a prudent man, who knew the amount and condition of the timber standing on the land, would not have agreed to purchase at the rate of four dollars and fifty cents per acre. But I am not satisfied, that the defendants knew the condition of the timber, nor that the land was worthless for lumbering operations. The fact that practical lumbermen have operated upon it, so many years since 1835, is quite decisive on this point. These and some other circumstances, would have been entitled to a more rigid scrutiny, if the transaction were recent, and the plaintiff had approached nearer, to making satisfactory proof of the more specific charges of fraud in his bill. But, independent of the fraudulent concealment, by the defendants, of the state of the timber, alleged, but not to my satisfaction proved, they do not of themselves afford ground for relief, by reason of fraud; and I have therefore, not thought it necessary more particularly to allude to them. For similar reasons, I have not spoken of some of the points made in behalf of the defendants, and particularly of the defendant Boody. But it may be proper to state, what was conceded by the plaintiff's counsel, that his connection with these transactions was, if any, a mere legal relation, he not having, at any time, actually participated in them.

The bill is to be dismissed; and as to costs, I shall follow, what I understand to be a settled rule, that if a bill charges fraud, which is not proved, and the bill is dismissed, the plaintiff must pay costs.