## BARR v. PITTSBURGH PLATE-GLASS CO. et al.

(Circuit Court of Appeals, Third Circuit. August 15, 1893.)

1. CORPORATIONS—DIRECTORS—INDEPENDENT BUSINESS.
Directors, who are also officers, of a manufacturing corporation, if acting in positive good faith to the corporation and their co-stockholders, are not precluded from engaging in the building and operation of other distinct works in the same general business, (here the manufacture of plate glass;) and they do not stand, in respect to said works, in any trust relation to the corporation. 51 Fed. Rep. 33, affirmed.

2. SAME—EQUITY—CONTRACT WITH DIRECTORS.
A stockholder and a director of a plate-glass manufacturing company built other plate-glass works, and at the solicitation of other stockholders sold them to the company. They refused to state the cost of the works, and the consolidation was made on the basis of capacity in production. This arrangement was ratified by unanimous vote at a stockholders' meeting, and no stockholder not present at such meeting ever objected thereto. Objection was thereafter made by a stockholder who had been present, on the ground that the price paid for the new works had been excessive. Thereupon the former owners of said works offered to rescind the sale, but a committee appointed by the stockholders not interested in said works reported adversely thereto, which report was ratified by 7,357 out of a total of 7,988 of such disinterested shares. *Held*, that a stockholders' bill, praying relief on the ground of fraud in this transaction, should be dismissed. 51 Fed. Rep. 33, affirmed.

3. SAME.

The directors and one other stockholder of a manufacturing corporation, owning among themselves a majority of the stock, conceived that the demands of trade required the erection of additional works, which they desired the corporation to build, but the project was defeated by minority stockholders. The projectors then proceeded with their own funds to build independent works. Bad faith to the corporation was not imputable to any of them. When the works were nearing completion the corporation bought them upon terms not unconscionable in themselves, and which had been approved by a stock vote of 16,706 to 1,174 shares. The vendors, desiring to have the question decided by the minority stockholders, withheld their own votes until a large majority of the other stockholders had voted in favor of the purchase, and then cast their votes with the majority of the minority. The plaintiff, a minority stockholder, by his bill sought to reduce the vendors' profit. *Held*, that he was not entitled to relief. 51 Fed. Rep. 33, affirmed.

4. SAME—DIRECTOR'S CONTRACTS.

A director of a joint-stock company may make a valid contract with the company, if in so doing he deals fairly and honestly with the stockholders who have appointed him their agent. Oil Co. v. Marbury, 91 U. S. 587, followed.

5. COSTS—PLAINTIFF'S FAILURE TO PROVE FRAUD—LIABILITY.

A stockholders' bill, charging certain directors with fraud in contracts made by them with the corporation, and seeking to enforce the restitution of exorbitant profits made by them in such contracts, was dismissed for want of equity. *Held*, that plaintiff must pay the costs.

Appeal from the Circuit Court of the United States for the Western District of Pennsylvania.

In Equity. This is a stockholder's bill, filed by Samuel F. Barr, a citizen of the state of Maine, against the Pittsburgh Plate-Glass Company, a corporation of Pennsylvania; Edward Ford, Artemus Pitcairn, Emory L. Ford, and John Pitcairn, Jr., officers and directors of the said corporation; J. B. Ford, Edward Ford, Emory L. Ford, Artemus Pitcairn, and John Pitcairn, Jr., associated together under the firm name of J. B. Ford & Co. The bill was filed against the above-named officers and directors on the ground that they controlled the corporation and prevented a suit by the latter. The bill charges combination and conspiracy, on the part of the persons named as respondents, to defraud the corporation, and seeks to charge them as trustees, and to compel a restitution of illegal profits made by them out of contracts with the corporation. A demurrer to the bill was overruled, and a decree thereafter rendered for the respondents. Complainant appeals.

The bill alleges, in substance:

(1) That J. B. Ford, Edward Ford and Emory L. Ford, sons of J. B. Ford, were the promoters of an organization known as the New York City Plate-Glass Company, organized under the laws of New York, with a capital stock of $600,000, all of which said Fords took in consideration of a plate-glass works plant about to be by them constructed. (2) That the plaintiff was an owner of shares of stock in that company. (3) That the New York City Plate-Glass Company was reorganized under the laws of Pennsylvania, under the name of the Pittsburgh Plate-Glass Company, in August, 1883, taking over to itself all the assets of the former corporation, and having the same capital stock. (4) That the said John Pitcairn, Jr., Edward Ford, Emory L. Ford, and Artemus Pitcairn, being directors of the Pittsburgh Plate-Glass Company, and J. B. Ford, entered into a conspiracy and combination to erect and build similar plate-glass works of larger capacity at Tarentum, in Alle-

gheny county, Pa., about a mile distant from the works of the Pittsburgh Plate-Glass Company, and to compel the said Pittsburgh Plate-Glass Company to purchase the same, to prevent a dangerous and destructive competition therefrom, for the price of 10,000 shares of the capital stock of said company, of the par value of $1,000,000, worth then in the market $155 per share, making the real consideration $1,550,000; and that at the time the said John Pitcairn, Jr., Edward Ford, Emory Ford, Artemus Pitcairn. and J. B. Ford held together 4,350 shares out of 6,000 shares of the capital stock; that said sale was consummated; that any information as to the actual cost of the works was refused to stockholders; and the bill avers that the actual cost of the said works did not exceed $647,000. (5) That thereupon the capital stock of the Pittsburgh Plate-Glass Company was increased to the amount of $2,000,000, and purchase-money shares, as aforesaid, were issued to the vendors; and that, a division of the purchase-money stock having been made, the said J. B. Ford was made to appear as the owner of 4,000 shares, John Pitcairn, Jr., of 8,212 shares, Emory L. Ford of 500 shares, and Artemus Pitcairn of 200 shares. That the board of directors at that time consisted of John Pitcairn, Jr., Edward Ford, Emory L. Ford, Artemus Pitcairn, and John Scott, (since dead,) Edward Ford being the president, Emory L. Ford, secretary, and John Pitcairn, Jr., having resigned the vice presidency, Artemus Pitcairn succeeded him in that office. (6) The bill further avers that the said John Pitcairn, Jr., Edward Ford, E. L. Ford, and Artemus Pitcairn, directors of said company, entered into a conspiracy with J. B. Ford to erect another and additional plate-glass works at Ford City, Armstrong county, Pa., and to compel the Pittsburgh Plate-Glass Company to purchase the same, at such price as they might see fit to exact, by reason of the menace which said works so constructed would present of disastrous or ruinous competition should the Pittsburgh Plate-Glass Company not make the purchase of the same; and that these persons formed a conspiracy, under the name of J. B. Ford & Co., to construct such works, and at the date of the filing of the bill had proposed to sell them to the Pittsburgh Plate-Glass Company for $750,000 of first-mortgage bonds and $750,000 of the capital stock of the company, to be issued at par, the bonds to mature in three, four, and five years, with interest at 6 per cent.; and that the capital stock of the company at that time commanded a premium of $62.50 per share, so that the price aforesaid in reality amounted to $1,968,750; and that the said works when completed would not cost more than $1,000,000. (7) That said directors and J. B. Ford claimed the right to build competitive works for their own benefit, to be operated by themselves, or to be sold to others for 'that purpose; and that said Ford City works were then in partial operation, and constituted a direct threat and menace to the Pittsburgh Plate-Glass Company to compel them to accede to the demands of the syndicate; and that said syndicate controlled about seven-tenths of the capital stock of said company, upon the then capitalization of the company. (8) That the directors, together with J. B. Ford, in pursuance of such conspiracy, by their undue influence and efforts, had procured a vote authorizing the acceptance of said offer to sell said Ford City works, and to that end had taken steps to procure an increase of the capital stock of the company to $2,750,000, and to procure the amendment of their charter powers to enable them to carry on their corporate business in other counties than the county of Allegheny. (9) That all the members of the board of directors of the Pittsburgh Plate-Glass Company, and all the officers thereof except the treasurer, were members of the syndicate firm of J. B. Ford & Co., and were interested in the consummation of the proposed sale of the Ford City works, and that seven-tenths of the capital stock of the company were held by them.

The bill then proceeds to aver that the said directors, acting in concert with the said J. B. Ford, he, the said J. B. Ford, knowing their official and trust relation, are prohibited from acting in derogation of the interests they represent as officers and directors to the prejudice of the Pittsburgh Plate-Glass Company, and that the works so erected by them were equitably the property of said Pittsburgh Plate-Glass Company, for the construction of which they, said corporation, should pay the actual cost thereof, with such reasonable profit as the court might allow to the constructors thereof.

A demurrer was filed, which was overruled, and thereafter the defendants made answer, admitting the building and sale of the Tarentum works, and the proposed sale of the Ford City works, and also admitting the withholding of information from the stockholders as to the cost of either of those works, and deny that the cost of the Tarentum works was only $650,000, or that the cost of the Ford City works was only $1,000,000. They admit that the stock of the company bore a premium in the market at the time of these transactions, but deny that the premium was as much as is averred in the bill. They also deny that Edward Ford, Emory L. Ford, and Artemus Pitcairn were interested in the building or in the profits derived from the sale of the Tarentum works, but they admit that the Ford City works were built by a partnership consisting of all the directors of the Pittsburgh Plate-Glass Company then living, including therein the president and vice president of said company. The answers set up as justification for the purchase of the Tarentum works that such purchase was the unanimous vote of the stockholders, at a meeting called to consummate the purchase thereof, and, as respects the Ford City works, that the stockholders had refused to build such works; and aver good faith to the minority stockholders in both transactions, and also aver their legal right to act as they did.

The bill was filed to May term, 1889, prior to the meeting called for the purpose of increasing the capital stock and the indebtedness of the company to provide means for the purchase of the Ford City works, but that meeting was subsequently held, and a vote taken, and the property conveyed, with full notice of the pendency of this bill.

A replication having been filed, testimony was taken before an examiner. The case was argued upon the testimony and the law involved before the circuit judge, presiding in the circuit court of the United States for the western district of Pennsylvania, who adjudged that the bill should be dismissed, at the cost of the plaintiff; and in his opinion filed held that the plaintiff was not entitled to the relief prayed for as to either of the properties; that the defendants in the various transactions had a right to build the two works specifically described, and that their action in the premises was in good faith, and that the said purchase had been duly ratified by the stockholders, and that offers of rescission made by the vendors of said works to the stockholders had been refused.

S. Schoyer, for appellant.

D. T. Watson, for appellees.

Before DALLAS, Circuit Judge, and BUTLER and WALES, District Judges.

WALES, District Judge, (after stating the facts.) The charges of conspiracy and fraudulent combination made against the defendants, and which are specifically set forth in the plaintiff's bill, involve questions of fact which are to be decided on the proofs. These charges cover two distinct and separate transactions, which will be considered in the order of their occurrence.

1. The sale and purchase of the Tarentum works. It is very clear that J. B. Ford was the original and sole projector of these works, and that he had made all the preparations for building them, by the purchase of land and materials, on his own responsibility, without the knowledge or aid of any one of his codefendants, and that as soon as his design became known to them they immediately opposed its further prosecution. At this time—in the year 1885 —the defendants owned a majority of the stock of the Pittsburgh Plate-Glass Company, and, with the exception of J. B. Ford, were directors of the company. Edward and Emory L. Ford, the sons of

J. B. Ford, opposed the erection of the Tarentum works by their father on account of his advanced age, and for fear that he would become embarrassed financially; and the other defendants saw in the new enterprise a serious rival to the works already in successful operation at Creighton; but, finding their remonstrances to be unavailing to deter J. B. Ford from the prosecution of his plan, it was proposed by John Pitcairn that the Tarentum works should be built by the Pittsburgh Plate-Glass Company, which would thus have the control of them and prevent competition. In this measure, however, he had no support from any of his fellow stockholders. The junior Fords were unwilling to embark on such an undertaking, because it might stop dividends on their stock, and run the company in debt. The majority of the stockholders were opposed to the company assuming the work for various reasons. Finally, at the instance and on persuasion of the Ford brothers. and others, who together owned nearly five-sixths of the outstanding shares of the company, John Pitcairn formed a partnership with J. B. Ford by purchasing with his own money one-half of the latter's interest in the Tarentum works as far as they had progressed, and the partnership thus formed, under the name of J. B. Ford & Co., carried on the works to completion, without further objection or opposition from any member of the Pittsburgh Plate-Glass Company. Under the terms of the partnership agreement between J. B. Ford and John Pitcairn, dated the 6th of October, 1885, John Pitcairn was to contribute $65,000 to the capital of the firm on the understanding that after that sum had been expended all additional amounts required should be furnished in equal shares. by the partners. One, if not the principal, object in view in forming this partnership was to keep the Tarentum works in friendly hands, and to prevent them from being operated to the prejudice or injury of the Pittsburgh Plate-Glass Company. In the spring or summer of 1886, the new works being nearly completed, and it being evident that they were of larger capacity, and would manufacture plate glass cheaper and in greater quantities than could be done at Creighton, Mr. John Scott, then a large stockholder and a director of the Pittsburgh Plate-Glass Company, considered that it would be greatly to the advantage of the company to acquire Tarentum. There was some difficulty at first in bringing about that result, and it encountered the opposition of each of the partners of J. B. Ford & Co. John Pitcairn was on the eve of going abroad, and J. B. Ford thought it would be more advantageous to his interests not to sell. Application, however, being made to J. B. Ford & Co. to state on what terms a sale or consolidation could be effected, the firm thought that the relative capacity of the two works should be the basis of the union, and that, as the Tarentum works had double the capacity of those at Creighton, the same proportion should be observed in providing for the union of the two concerns, a reasonable allowance being made for the unfinished condition of the Tarentum works. The first plan of consolidation, consented to by J. B. Ford & Co., was that the capital stock of the

Pittsburgh Plate-Glass Company should be increased from $600,000 to $1,920,000, to be divided as follows: To J. B. Ford & Co., for Tarentum, $1,120,000; to the stockholders of the Pittsburgh Plate-Glass Company, $200,000; the Tarentum works to be finished by J. B. Ford & Co. A meeting of the board of directors of the Pittsburgh Plate-Glass Company was held on July 2, 1886, at which this proposed arrangement was submitted, and on motion a stockholders' meeting was called for September 6, 1886, to consider the proposal, and the board recommended its acceptance. At the directors' meeting held on July 2, 1886, John Pitcairn asked to be and was excused from voting on account of his personal interest in the transfer of the property. Notice of the stockholders' meeting to be held on September 6, 1886, and of its purpose, was given by public advertisement, and by a circular directed to each stockholder; and on the day appointed for the meeting 5,515 shares out of the whole issue of 5,950 shares were represented. Mr. Barr, the plaintiff, presided at that meeting, and announced to the stockholders present that they had the power to "amend, alter, reject, or affirm the proposition" recommended by the directors. After some discussion J. B. Ford & Co. were requested to state the cost of the Tarentum works, which they refused to do, for the reason that the basis of the proposed transfer was the relative capacity of the two works. Finally, J. B. Ford & Co. submitted the following terms of consolidation, namely: That the capital stock of the Pittsburgh Plate-Glass Company should be increased from $600,000 to $2,000,000, of which Creighton should represent $800,000, subject to a mortgage of $134,000, and Tarentum should represent a capital stock of $1,000,000; that of this stock increase $200,000 should be distributed among the Creighton stockholders at that date as dividend, and that $1,000,000 in stock at par should be issued to J. B. Ford & Co., leaving $200,000 to be issued and sold to the stockholders on September 6, 1886, at par, for a working capital. These terms were approved and accepted by the unanimous vote of the stockholders present, and there is no evidence to show that any shareholder who was not represented at the meeting has ever disapproved of its action. On October 27, 1886, J. B. Ford & Co. conveyed the Tarentum works to the Pittsburgh Plate-Glass Company, and received from the latter the entire purchase consideration, $1,000,000 of its stock at par; but, as the Tarentum works were still incomplete, J. B. Ford & Co. pledged $200,000 of the stock at par with the treasurer of the Pittsburgh Plate-Glass Company as security for the completion of Tarentum. The Pittsburgh Plate-Glass Company took possession of Tarentum, and have operated the same ever since. The Tarentum works were completed by J. B. Ford & Co. in the spring or summer of 1887, but it was not until April 17, 1888, that the firm made a formal demand on the Pittsburgh Plate-Glass Company for the return of the pledged stock, whereupon, at a meeting of the board of directors, a resolution was adopted instructing the treasurer to deliver the stock. This resolution was passed over the protest of Mr. John Scott, one of the directors, and the

treasurer refused to obey the instructions of the board. At a subsequent meeting of the board of directors, held on November 20, 1888, a protest signed by several of the stockholders was presented, stating in substance that J. B. Ford & Co. had, in violation of the duty they owed to the company and its stockholders, voted to themselves and received a price for the works at Tarentum grossly in excess of the cost and value thereof, and have no claim either in law or conscience to the stock now demanded by them; and the protestants requested that a meeting of the stockholders should be called, to have a full and fair investigation of the whole matter. Accordingly, a meeting of the stockholders was held on December 5, 1888, the proceedings of which disclosed much dissatisfaction on the part of several who were present with the alleged excess of price received by J. B. Ford & Co. for Tarentum, whereupon Mr. John Pitcairn stated that, if the stockholders repented the acquisition of Tarentum, his firm would agree to a rescission of the contract of sale, and he submitted a written proposition to that end. In that paper the whole transaction is reviewed, and it concludes with the promise that J. B. Ford and John Pitcairn, who owned a majority of the stock, would refrain from voting on the question of rescission, and leave its settlement to the minority stockholders. At this stage of the proceedings, on motion of a minority stockholder, a committee of five was appointed "to thoroughly investigate all the circumstances connected with this complaint, and this proposition of Mr. Pitcairn's, and also to recommend a course of action for the minority stockholders, and that their report be made at the next regular annual meeting of the company, to be holden in January." This committee consisted exclusively of minority stockholders, who at once entered on the discharge of their duties, and called before them several witnesses, whose testimony is fully reported in the record. The investigation by the committee appears to have been conducted with considerable zeal and industry, and on January 22, 1889, at the annual stockholders' meeting, they presented a unanimous report, stating that by the delay of J. B. Ford & Co. in completing the Tarentum works the company had suffered no estimable damage; that the committee was unable to decide whether J. B. Ford & Co.'s profits were more than they were entitled to or not, as they could not ascertain the cost of the works. The report observes that the building of plate-glass works by the principal stockholders or officers of the Pittsburgh Plate-Glass Company that may hereafter be in competition with the company is, at least, questionable as to the good faith of such transactions; but in the judgment of the committee the acquisition of the Tarentum works has been on the whole favorable to the general interests of the company, and the transaction should not be disturbed; and that the proposition for rescission should not be entertained. This report was adopted by a vote of 19,369 shares out of a total of 20,000 shares represented. J. B. Ford and John Pitcairn then held 12,012 shares, leaving in the hands of the other stockholders 7,988 shares, of which last number 7,357 voted to adopt the report. With the adoption

of this report it would seem that the manner and the terms of the sale of Tarentum had been ratified by the stockholders. The proofs show that the estimated value of Tarentum at $1,000,000 was no greater, proportionately, than the estimated value of Creighton at $800,000, subject to a debt of about $134,000; that, after the consolidation of the two works, the dividends of the Pittsburgh Plate-Glass Company were largely increased, and that there was a marked advance in the price of its stock. These facts have not been controverted.

The real ground of complaint against the defendants is that they made excessive profits on the sale of Tarentum; otherwise there would have been no charge of conspiracy and combination to compel the Pittsburgh Plate-Glass Company to buy a property which has proved to be so advantageous to the stockholders. But if Tarentum was estimated beyond its cost, so also was Creighton. If Creighton was worth $800,000, subject to a debt of $134,000, Tarentum, with its improved machinery and large capacity for production, was equally worth $1,000,000. All this was known to the stockholders of the Pittsburgh Plate-Glass Company on September 6, 1886, when the manner and terms of the sale were agreed upon, and the stockholders subsequently received the very large profits arising therefrom in stock and cash dividends. Two years after the sale a protest was made by some of the minority stockholders against the delivery of the stock which had been pledged by J. B. Ford & Co. for the completion of Tarentum, because of the exorbitant price paid to that firm, and a thorough investigation of the whole matter was demanded by the protestants, under the threats of legal proceedings. The result of that investigation was a reluctant admission, on the part of the committee who conducted it, that the acquisition of Tarentum had been advantageous to the Pittsburgh Plate-Glass Company, and a recommendation that the transaction should not be disturbed, which was approved by an almost unanimous vote at a general meeting of the stockholders. In the light of such evidence it is impossible to sustain the charge of conspiracy and fraudulent combination made against the defendants. Three of the defendants, indeed, had no direct interest in the affairs of J. B. Ford & Co., not being members of the firm. J. B. Ford was personally interested in the property and success of the Creighton works, which were doing a highly lucrative business, and could not fill their orders. He desired to establish other works, for the purpose of extending the business which produced such profitable returns, to be operated in harmony with Creighton, and not to its injury; and being a stockholder of the Pittsburgh Plate-Glass Company did not deprive him of the right to do this. His two sons were also stockholders, and it would be unreasonable to suppose that he intended to defraud or injure a company in which he and his sons were so largely interested. John Pitcairn formed a partnership with J. B. Ford for building the Tarentum works, at the suggestion and with the knowledge and approval of some of the minority stockholders of the Pitts-

burgh Plate-Glass Company, for the express purpose of protecting the interests of the company; and there is no proof that the firm of J. B. Ford & Co. intended to operate the Tarentum works in competition with or to the prejudice of Creighton. The proposal to consolidate the two works came from the Pittsburgh Plate-Glass Company, and not from J. B. Ford & Co. In fact the firm did not at first appear to be inclined to entertain the proposal, Mr. Pitcairn being on the eve of going abroad for his health, and Mr. J. B. Ford preferring to have the Tarentum works operated independently of any other. However, an offer being invited from J. B. Ford & Co., negotiations were begun, and terminated as already stated. There is no proof of fraud in the transaction, or of misrepresentation. J. B. Ford & Co. refused to disclose the cost of Tarentum, because they might want to sell it, or organize another company. This refusal, and the reasons for it, were publicly made at the stockholders' meeting of September 6, 1886, and the request for a statement of the cost was not pressed. No facts are proved by which a resulting trust can be established in favor of the Pittsburgh Plate-Glass Company. J. B. Ford & Co. built the Tarentum works with their own money, and on their own credit and risk; nor did they make themselves trustees by any wrongful acts of their own. They did not use the property or the credit of the Pittsburgh Plate-Glass Company, nor were they under any obligation, legal or equitable, which prohibited them from erecting the new works, and consolidating them with the Creighton works, on terms which have proved to be equally beneficial to all the parties concerned. The purchase of Tarentum appears to have been ratified and settled, and no further objection was made in reference to it until the negotiations were set on foot for the acquisition of what are known as the Ford City works.

2. The purchase of the Ford City works. In the summer of 1887 the defendants, being then stockholders, and, with the exception of J. B. Ford, directors, of the Pittsburgh Plate-Glass Company, in view of the existing and prospective condition of the plate-glass business, concluded that additional works for its manufacture were needed. Creighton and Tarentum were behind with their orders, and could not supply the demand for their products. The making of plate glass in the United States was a comparatively new enterprise, and the home production did not equal one-half of the home consumption. J. B. Ford had been a pioneer in the business, and he and his codefendants, seeing the impossibility of the Pittsburgh Plate-Glass Company retaining a monopoly of the business, and the certainty of an increased importation of the foreign article, were of the opinion that additional works should be erected. The profits which had been already realized by the company on a watered stock of several hundred thousands of dollars would, the defendants thought, be sure to excite competition, and that it would be wise for the company to make provision for meeting such competition by adopting new machinery and appliances for reducing the first cost of production. So strongly convinced

were the defendants of the necessity of extending the company's works that they began to look around for a suitable location for the buildings, and had selected a place in Armstrong county, Pa., and secured options for the purchase of several hundred acres of land. It had already come to the knowledge of John Pitcairn that certain parties in Philadelphia and Pittsburgh had contemplated the organization of glass works near the latter city, which would come into direct competition with the Pittsburgh Plate-Glass works. Such being the condition of things, a special meeting of the board of directors of the company was held on September 8, 1887, at which the following preamble and resolution were adopted, and a special meeting of the stockholders was called for the 20th of September, 1887, to consider the same:

"Whereas, in the judgment of the board the present condition and prospects of the plate-glass business, and the position of this company in relation thereto, are such as to render it expedient that the company should as quickly as possible erect additional works at such point as shall be determined, and with this view inquiries have been made looking to the securing of an eligible location:

"Resolved, that the board recommend to the stockholders the erection of additional works, of a capacity not less than 300,000 feet per month, at such point as shall be selected by the stockholders or directors."

In pursuance of the call a special meeting of the stockholders was held on September 20, 1887, at which the recommendation of the board was fully discussed and rejected, the plaintiff being most earnest in his opposition thereto, and pointing out that under its charter the company had no power to manufacture plate glass outside of Allegheny county. At this meeting, and before the vote was taken, the defendants, being the owners of a majority of the stock, notified the stockholders present that they would not vote their stock, but leave the adoption or rejection of the recommendation of the board to the decision of the minority stockholders, as the defendants did not wish to compel a compliance with their own opinion against a majority of the minority. The proceedings of this meeting, and the good faith of the defendants in calling it, have been severely criticised by the counsel for the plaintiff, but the weight of the testimony satisfactorily proves that the question of building the new works by the company was fairly left to the minority stockholders, and that the recommendation of the defendants was honestly made. The advice of the board having been refused, J. B. Ford and John Pitcairn determined to go on with the Ford City works, and took into partnership with them their three codefendants, Edward Ford, Emory L. Ford, and Artemus Pitcairn, assigning to each of the last three a one-ninth interest, and taking for each of themselves three-ninths interest in the undertaking. The interests of the defendants in the Pittsburgh Plate-Glass Company were so large at this time as to exclude all idea of their intention to depreciate their value or to diminish their profits. On the contrary, they had the strongest motive to protect their interests, to make them still more profitable, and to ward off competition as long as possible. Having purchased the

required land, they proceeded to build the works with their own capital and on their own credit, with the knowledge of and without objection from the plaintiff or any other minority stockholder. At the stockholders' meeting on January 22, 1889, after the Tarentum and other business had been disposed of, a committee was appointed, consisting of the same five members who had acted on the Tarentum committee, and who were adverse to the further extension of the company's works, "to negotiate with J. B. Ford & Co. for a transfer of the plate-glass works located at Ford City," and to report the terms at a special meeting of the stockholders to be called by the president of the company at the request of the committee. This committee held several sessions to consider the subject referred to them. The first offer of J. B. Ford & Co. was to sell the new works for $1,500,000 in the glass company's stock at par, with the condition that they would sell the one-half of this stock to the stockholders of the company at par. As they had done in the sale of Tarentum, J. B. Ford & Co. refused to give the committee a statement of the cost of the Ford City works, and for similar reasons, but they did finally impart to the committee in confidence the best estimate of what the works would cost when finished. Subsequently this offer was modified to this effect: that the defendants would sell the works completed for $750,000 in stock of the company at par, and $750,000 in bonds secured by a mortgage, and payable in three, four, and five years, which offer was reported favorably by the committee to a special meeting of the stockholders held on April 9, 1889, which, after a prolonged discussion on the report, adjourned to meet on the 16th of April, 1889, when the report was accepted, and a resolution was adopted to have the charter of the company amended, authorizing it to manufacture its products in other places than Allegheny county. Before the vote was taken on the adoption of the report, the announcement was made that J. B. Ford & Co. would refrain from voting their stock, which constituted a majority of the whole issue, until the result of the vote by the minority stockholders should be known, when it would be cast with the majority of the minority, in order to constitute a legal vote. The total vote cast was 17,880, of which number 16,706 were in favor of the resolution to adopt the report of the committee, and 1,174 opposed; 2,120 shares not voting. At this meeting J. B. Ford & Co. agreed that $750,000, received by them in part payment of the Ford City works, should not participate in the profits of the Pittsburgh Plate-Glass Company for the year 1889.

On April 17, 1889, a stockholders' meeting was called by the board of directors to be held on June 18, 1889, for the purpose of voting on the increase of the capital stock of the company and the issuing of bonds for the purchase of the Ford City works. In the mean time—May 8, 1889—the plaintiff had filed his bill, and before the day appointed for the next meeting of the stockholders J. B. Ford & Co. addressed a letter to each stockholder, stating, in substance, that they were willing to rescind the contract for the purchase of the Ford City works if a majority of the minority stockhold-

ers sympathized with, or were in favor of, prosecuting the plaintiff's suit. At the stockholders' meeting, on June 18, 1889, the vote in favor of increasing the capital stock was 17,205, and no votes were cast in the negative. The Pittsburgh Plate-Glass Company took possession of the Ford City works on July 1, 1889, and have remained in possession since that date.

The purchase of the Ford City works, up to the close of the evidence as set out in the record, has been highly advantageous and remunerative to the Pittsburgh Plate-Glass Company. Notwithstanding the great increase in the number of shares issued to pay for Tarentum and Ford City works, their market price continued to advance until it had reached the figure of $200 per share. The cost of the Ford City works was about $1,200,000, and when it is considered that, in addition to the outlay of money, the defendants also contributed their time, practical experience, and intelligent personal supervision from the beginning to the completion of the works, and were also subjected to the risks of failure, the price ultimately received by them does not appear to be excessive. It is true that the stock paid to them at par had been selling at a premium, but it does not follow that, if the new issue had been thrown on the market in bulk, the premium would have been maintained. The defendants assumed the risk and labor of the enterprise, and were entitled to a reasonably liberal profit.

The proofs fail to sustain the charge of conspiracy and combination. The defendants acted openly, and made no false representations. They afforded the company the opportunity of building the works, and advised them of the necessity of doing so, and gave notice that if the company did not build they would. As majority stockholders of the Pittsburgh Plate-Glass Company the defendants were more deeply concerned in the prosperity of that company than were the plaintiff and those who agreed with him. The defendants did not use any of the property of the company or employ its credit in the erection of the Ford City works, and here, as in the case of the Tarentum purchase, the proof does not establish a resulting trust, or a trust ex maleficio. There was no conspiracy or combination to compel the purchase of the defendants' works, either at Tarentum or in Armstrong county; nor was the price paid for either one of the properties so large as to give the defendants an excessive or exorbitant profit on their actual outlay of money, time, and labor. There has been no proof of fraud in these transactions, nor of a misuse of the power and influence of the defendants, as majority stockholders, to deprive the minority stockholders of any right.

It has been settled that a director of a joint-stock corporation may make a valid contract with the corporation of which he is a member, provided that, in doing so, he deals fairly and honestly towards the stockholders who have appointed him their agent. Oil Co. v. Marbury, 91 U. S. 587; Leavenworth County Com'rs v. Chicago, R. I. & P. Ry. Co., 134 U. S. 688, 10 Sup. Ct. Rep. 708. The Tarentum and the Ford City works were the property of the de-

fendants, and were bought by the Pittsburgh Plate-Glass Company with a full knowledge of all the circumstances under which they had been erected, and it is evident that the company has not been injured, but has been greatly benefited, by their acquisition. It must not be overlooked, too, that in reference to the purchase of Tarentum the proceedings to set it aside, or to alter the terms thereof, were not taken until after the lapse of more than two years from the execution of the contract,—a delay which, of itself and unexplained, might be fatal to that portion of the plaintiff's complaint. Oil Co. v. Marbury, supra.

The plaintiff's solicitor now asks that his client shall be relieved from the payment of costs in the event of the decree below being affirmed, on the assumption that he has made an honest effort to redress what he considers to be wrongs against his company, and to enforce a restitution of enormous profits made by the defendants out of the company. The authorities cited in support of this request are Trustees v. Greenough, 105 U. S. 527; Warrell v. Railroad Co., 130 Pa. St. 600, 18 Atl. Rep. 1014. These were cases, however, in which a fund had been recovered, or property had been saved by the litigation, and the court allowed the expenses as between solicitor or attorney and client to be paid out of the fund. In each case the statutory costs had been given to the prevailing party. But here the plaintiff has not succeeded in proving his charges, and the rule appears to be settled that, where a bill charges fraud, and the bill is dismissed, the plaintiff must pay the costs. Fisher v. Boody, 1 Curt. 206.

The decree of the circuit court is affirmed.