SALEM IRON CO. v. LAKE SUPERIOR CONSOL. IRON MINES.

(Circuit Court of Appeals, Third Circuit.  December 13, 1901.)

No. 34.

1. CORPORATIONS—VALIDITY OF CONTRACTS—IMPLIED DELEGATION OF AUTHORITY BY DIRECTORS.

While a corporation cannot incur an obligation without the authority or consent of its board of directors, such authority may be delegated to the executive officers with respect to certain classes of transactions as well as to a particular transaction, and a corporation may be bound by a consent implied by law from a course of conduct permitted and recognized by its directors.

2. SAME—RATIFICATION.

Where, for any reason, a contract made on behalf of a corporation by its officers is voidable at the instance of the corporation, such contract may be ratified by the board of directors either by express resolution or by action of the board as an organized body, taken with full knowledge of the facts, which treats it as in force, or otherwise recognizes its validity; and a failure of the board, having such knowledge, to disaffirm it within a reasonable time, will amount to a ratification.

3. SAME—VOID OR VOIDABLE CONTRACT—EXECUTION BY OFFICER ACTING FOR BOTH PARTIES.

The president of an iron works corporation entered into a contract for the purchase of ore for the works in accordance with the usual course of the company's business, and in the same manner that other similar contracts had been made.  He signed the contract for the company, and also for a firm, of which he was a member, as agent for the seller.  The firm was the owner of $50,000 of the company's stock, which was one-fifth its entire capital stock, and was also its creditor for $45,000.  The firm's commission on the sale was $1,500, and was not dependent on the price paid for the ore.  *Held*, that the fact that the president acted in a dual capacity in the execution of the contract did not, under such circumstances, render it void, but only voidable, unless there was proof that his conduct was unfair, oppressive, or fraudulent toward the company.[1]

4. SAME—ACTION FOR BREACH—QUESTIONS FOR JURY.

Such contract was executed in December, and the ore was to be delivered monthly during 12 months beginning in May.  There were monthly directors' meetings thereafter, and there was evidence tending to show that the contract was reported to and discussed by the board, and that the individual directors had knowledge of it previously; but such evidence was contradicted.  There was also evidence of the existence of a de facto executive committee, of which the president was a member, which authorized the contract, and also made others of a similar character at the same time and prior thereto, all of which had been recognized and treated as valid.  No formal action was taken by the board of directors on the contract in question until the following December, after a part of the ore had been delivered thereunder and paid for, when the board passed a resolution repudiating the same.  *Held*, that the questions whether the contract was authorized by the board or ratified, either by consenting thereto or by failing to disaffirm within a reasonable time, were all properly submitted to the jury.

5. DAMAGES—BREACH OF CONTRACT—QUESTIONS FOR JURY.

Where a contract for the sale and purchase of iron ore was repudiated by the purchaser before delivery had been completed, but after the seller had the ore on hand ready for delivery, and because of the close of the season there was at the time no open market for the ore remaining un-

---

[1] Power of corporate officers in their individual capacity to deal with corporation, see note to Bensiek v. Thomas, 13 C. C. A. 466.

delivered, the difference between the contract price and the best offer which could be obtained for it may be taken as a fair measure of the seller's damages in an action for breach of the contract; the testimony as to such offer, however, to be submitted to the jury to be considered by them in connection with any other evidence bearing on the question of the value of the ore at the time of the breach.

In Error to the Circuit Court of the United States for the Western District of Pennsylvania.

N. B. Billingsley and Edwin W. Smith, for plaintiff in error.

Harvey D. Goulder and Wm. Scott, for defendant in error.

Before ACHESON, DALLAS, and GRAY, Circuit Judges.

GRAY, Circuit Judge. The Salem Iron Company, the defendant below, plaintiff in error here, is a corporation organized under the laws of the state of Pennsylvania, and has its furnace plant in the state of Ohio. Its principal office is at Pittsburg, Pa. In 1897 it was compelled to reorganize, by an arrangement with its creditors, who took preferred stock for their claims. The capital stock had been $50,000, and was increased to $247,000, of which $197,000 was preferred. The number of directors was increased from three to seven, the majority of whom were to be nominees of the preferred stockholders who had control, the holders of the common stock having a minority representation. L. B. Miller, a member of the firm of Oglebay, Norton & Co., who had been creditors and took one-fourth of the preferred stock, was elected president in July, 1899. The said firm were also at the time of this transaction creditors of the said defendant company, without security, for the amount of $45,000. The subject-matter of this suit is what purports to be a contract in writing, dated December 29, 1899, between "the Lake Superior Consolidated Iron Mines, of New York City, by its agents, Oglebay, Norton & Co., of Cleveland, Ohio, party of the first part, and the Salem Iron Company, of Leetonia, Ohio, party of the second part." It was signed on behalf of the Salem Iron Company by L. B. Miller, as its president. It provides for the sale by the party of the first part to the party of the second part of 30,000 tons of Adams ore, at $4.85 a ton, in 12 monthly deliveries, to commence in May, 1900, and to continue until April, 1901. The payments were to commence on May 25, 1900, and were to be made every month, whether ore was received or not; the party of the second part, the Salem Iron Company, having the right to make the one-half of any of the payments by its note at four months. Apparently pursuant to the terms of said contract, the Salem Iron Company made its promissory note in favor of the Lake Superior Consolidated Iron Mines, dated May 26, 1900, for $12,367.50, at four months, which was paid when due, some time in September of that year, and covered 2,500 tons out of 2,543½ tons, shipped in the said month of September by the plaintiff company, and delivered to and received by the Salem Iron Company. The delay in shipping, according to the terms of the contract, was the subject of correspondence running through this period between Oglebay, Norton & Co., agents of the plaintiff company, and the executive officers of the defendant com-

pany. The price of pig iron and of ore had materially declined after the making of the contract in question, and shortly after September the furnaces in the plant of the defendant company went out of blast. On December 5, 1900, the following resolutions were passed by the board of directors of the defendant company, and a copy of the same forwarded to and received by Messrs. Oglebay, Norton & Co., agents of the plaintiff company:

"Resolved, that Oglebay, Norton & Company be notified that this company does not recognize the validity of the pretended contracts dated December 29th, 1899, for the purchase of 30,000 tons of Granada ore and 30,000 tons of Adams ore, executed on behalf of this company by Mr. L. B. Miller, and on behalf of the vendors by Messrs. Oglebay, Norton & Company. Resolved, that the secretary notify Messrs. Oglebay, Norton & Company that if they, or their principals, claim or intend to claim damages from this company for nonperformance of the pretended contracts of Dec. 29th, 1899, for the purchase of 30,000 tons of Granada ore and 30,000 tons of Adams ore, of which only about eight thousand tons have been delivered, this company requires them to sell said iron ore prior to Dec. 24th, 1900, in the open market, for the highest price obtainable."

Liability on this contract is denied by the defendant company, on the ground that the contract, as entered into and executed by L. B. Miller, as its president, was voidable, and that the defendant company, having the right to avoid it, effectually exercised that right by the above-stated resolution of its board of directors, passed December 5, 1900. The validity of this defense depends upon these, or some of these, propositions of law and fact: (1) That Miller, the president of the company had no authority, express or implied, to make and execute the contract in question in its behalf; (2) that the said Miller, being a member of the firm of Oglebay, Norton & Co., the agents of the plaintiff, and by whom the contract in behalf of the plaintiff was made, could not, without the express consent of the defendant company to his double employment, bind said company by the contract executed by him in their behalf; (3) that there was no ratification of this contract, or evidence of consent on the part of the defendant company, prior to the said resolution of repudiation of December 5, 1900; (4) that the repudiation of the contract, and notice thereof to the plaintiff, was made as soon as practicable, and at the first meeting of the board of directors held after full knowledge on their part of all the facts in the case. These propositions present the material questions embraced in the numerous assignments of error set forth in the record. Undoubtedly the board of directors is generally the governing and controlling body of a corporation. Its policy and conduct within the scope of the purpose of its creation is in the absolute control of such directors. It cannot incur obligations without the consent of such board, or generally without its express authority; but the board of directors can exercise its plenary power by delegating its authority as to certain transactions or classes of transactions to its president or other executive officers, as well as by direct authorization of a particular transaction by express resolution to that effect. A corporation is an intelligent, though artificial, person; and, while its board of directors is its controlling mind, it may be bound, like a natural person, by a consent implied by law

112 F.—16

from a course of conduct permitted and recognized by its governing body. The minutes of the defendant company disclosed no resolution of the board of directors, conferring upon the president the authority to make the contract here in question, nor any express general authority to make such contracts. But there is testimony tending to show the existence of a de facto executive committee, consisting of three directors, of which the president of the company seems to have been ex officio a member, and that contracts for the purchase of ore and sale of the product, had for sometime theretofore been negotiated and made by the authority of this committee. There is also testimony to show that this committee authorized the making of the contract in question by the president of the company. Three other contracts for the purchase of ore from other parties represented by the same agents were made in the same way, and about the same time; and contracts for large quantities of ore were made the previous spring in the same manner. Such contracts had always been theretofore acquiesced in by the company, and were in accordance with the usual course of its business.

It was contended by the plaintiff, however, that, whether the president or executive committee were authorized or not to make and sanction the contract, such action on the part of the president of the defendant company being only voidable, and not void, it was, in effect, ratified by the company by the acquiescence of its board of directors, with full knowledge of all the facts and circumstances necessary and material to ratification on their part. The record discloses the fact of monthly meetings of the board of directors, following soon after the execution of said contract, and testimony tending to show that report was made at these meetings of this contract for the purchase of ore, together with others, and that discussion was had by the directors as to the operations of the company, involving its supply of ore and probable production of pig iron, and that, though no formal resolution of ratification was made or offered, all the contracts were treated alike, there being testimony that all the individual directors save one had full personal knowledge, before the meetings, of this contract, as of others, and that with this individual knowledge, these contracts made by the president of the company were not only not repudiated, but treated as valid. The testimony on this point, however, is conflicting, as on the part of the defendant there was testimony that no such reports were ever made to these meetings of the directors, no discussion had in regard to them, and that there was no opportunity at them to ratify or repudiate the same. It is true that, where ratification is necessary, it must be made by the board of directors as a board, and their assent individually to the act necessary to be ratified will not avail. But it is also true that an express resolution of ratification is not essential where it can be shown that the board of directors, as a board, received report or notice of the transaction requiring ratification, and, with full knowledge of all the circumstances surrounding it, not only failed to repudiate it, but treated it in the same category with other transactions of like kind, which admittedly imposed obligations upon the company. As evidence of ratification or consent on the part of the company would be

equally necessary whether the contract was invalid from want of authority in the president to execute it in behalf of the company or by reason of the fact that in executing the contract he was acting in a double relation, as representing both parties to the contract, this conflicting testimony was properly submitted to the jury on the general question of whether the contract was a subsisting and binding one by reason of the ratification of it by the corporation.   The record shows that much testimony was introduced by the parties plaintiff and defendant, and that some of it, at least, tended to show ratification by the board of directors of the contract in question months prior to the resolution of the board formally repudiating the contract.

Under this state of facts we think the question of ratification was properly submitted to the jury.   We think, also, it was proper to submit to the jury another aspect of this same question, viz. whether, with the knowledge shown to be possessed by all or nearly all the individual directors of the fact that this contract had been made, of its terms and the circumstances surrounding it, the formal resolution of repudiation had not been too long delayed to be effectual for that purpose.   In other words, that the board of directors had such knowledge of this contract that refusal for so long a period to disaffirm, amounted to ratification.   The argument of the plaintiff's brief is confined to the underlying questions thus stated, and it would serve no useful purpose to consider separately the numerous assignments of error contained in the record.

In view of what we have said, a careful reading of the charge of the court below discloses no reversible error.   We think the court correctly stated the law applicable to the facts of the case when it instructed the jury as follows:

"Moreover, if a contract within the power of that corporation to make—that is, with reference to the facts in this case, a contract for the supply of ore for its furnace—if such contract be made by the president or an executive committee, assuming to act for the company, but without express authority to so contract, it is the duty of the directors of the company, upon receiving notice of such contract having been made, to promptly disavow the same as binding upon the corporation; and, in case they fail to do so within a reasonable time, the law will hold them to have ratified the contract, and allow it to then become binding upon the company.   The law does not, in the case of a purchase, permit a delay, where the directors know of such purchase, to enable the company to speculate upon the chances of deciding profitably, after a lapse of time, as to whether or not they will disavow and refuse to accept the contract.   Applying these general principles to the case before us, we instruct you that, if the jury find from the evidence that the fact of the purchase of this Adams ore was made known to the directors of the company, and that they knew that such purchase was made in the usual course of business and in the mode customarily followed by the company's officers and hitherto recognized by the company, and they did not, within a reasonable time, express their dissent, their knowledge of the facts and their inaction in the face of such facts might amount to a ratification of such purchase by the defendant company. What would be a reasonable time for such repudiation is, under the proofs in this case, a question for the jury, and to them we submit it."

The plaintiff in error repeatedly dwells, in the assignments of error and in the argument of its brief, upon the fact that the court, in speaking of the ratification necessary to validate an unauthorized contract, spoke of ratification by the company, instead of by the

board of directors. We think, however, that the language thus used was not open to criticism as a general statement of the law in that behalf. It is the form in which the general proposition of law in this regard is usually stated, and it is to be noted that the counsel for the defendant below used this very language in their first prayer for instruction to the jury at the trial. It was as follows:

"(1) In order that the plaintiff may recover in this case, it must appear by a preponderance of the evidence that the contract sued upon is the contract of the defendant, and that, to be the contract of the defendant, it must have been executed on behalf of the defendant by one having authority to execute the same, or, if executed without authority, it must thereafter have been ratified by the company."

In its charge to the jury the court adopted this language verbatim. But the court went further, and, in answer to the twelfth point of the defendant below, said:

"We have instructed the jury that, unless this contract was ratified by the defendant company, acting through its board of directors, they should find for the defendant."

This would seem to be putting the case as favorably to the defendant as it was possible for the court to do.

The plaintiff in error also, by its assignments and its argument before the court, strongly objected to what was said by the court below in regard to the legal effect of the fact that L. B. Miller, who executed the contract on the part of the defendant below, was also a member of the firm of Oglebay, Norton & Co., who, as agents for the plaintiff below, negotiated the contract in their behalf. As to this, the language of the court is as follows:

"Comment has been made in this case upon the fact that Mr. Miller, the president of the Salem Iron Company, was a member of the firm of Oglebay, Norton & Co., the selling agents of the plaintiff company, and that he signed the contract on behalf of the defendant company and on behalf of the selling firm as well. The fact that such was the case, and that he acted in a dual capacity,—that is, acted on behalf of the Salem Iron Company and on behalf of the Lake Superior Consolidated Iron Mines,—does not necessarily and of itself invalidate the contract. The undisputed facts are that the firm of Oglebay, Norton & Co. were the owners of about one-fifth of the capital stock of the Salem Iron Company; that they were creditors of said company to the extent of some forty thousand dollars; that their commission on the Adams ore sale of five cents a ton was not fixed or determined by the price of the ore, and that the ore was sold at the regular market price for the year 1900 deliveries, and that the contract contained a provision that the price should be reduced to the lowest price at which the plaintiff company should sell to any one Adams ore during that year. Under these facts—which we do not understand are questioned—we are of opinion that, in view of the dual capacity in which Mr. Miller stood and acted, the contract, if valid in other respects, was not void, but voidable only by the defendant company on this particular ground alone of Mr. Miller's dual relation, unless the jury should find that Miller took advantage of his position to impose upon the defendant company a contract which was unfair, oppressive, or fraudulent."

We think in this the court below correctly stated the law, and intelligently instructed the jury as to its application. A contract so made was undoubtedly voidable, and not void, unless the proofs should show that the conduct of the person acting in such dual relation amounted to fraud. This it might do if it were unfair and one-

sided, and palpably to the advantage of one party alone to the contract. The firm of Oglebay, Norton & Co., of which Miller was a member, were owners of one-fourth of the preferred stock of the defendant company, and were unsecured creditors of the company to the amount of $45,000. Their interest in the contract in suit was a commission of $1,500. There is nothing, therefore, in the situation itself, that shows such a predominant interest in Miller as to suggest a motive on his part to deal to the disadvantage of the defendant company, and no effort was made by direct testimony to show that his conduct was unfair, one-sided, or oppressive. Under the facts disclosed by the record, these matters were properly submitted to the jury.

This brings us to the remaining question raised by the plaintiff in error,—as to the correctness of the court below in its instructions to the jury as to the measure of damage. The plaintiff company had, at the time of the repudiation of the contract by the defendant company, 27,450 tons of ore at the Cleveland docks (practically the balance of the ore called for by the contract), brought there and ready to deliver to the defendant company in pursuance of the contract. The pecuniary measure of the injury suffered by the plaintiff company by reason of the refusal by the defendant to receive the remainder of the ore called for in the contract at the contract price would be the difference between the money value of the ore yet undelivered and the price agreed to be paid for it by the defendant under the contract. The value of this ore to the mining company, for the purposes of this case, would properly be estimated by what it would bring in the open market, if there were such a market at the time. The testimony, however, discloses, and it is admitted on both sides, that there was no such open market at that time, the season for selling the product of the mines for that year having passed. The rules of law as to the measure of damages, however, are not so rigid or unreasonable as to deprive the plaintiff of remedy in such a case. In the practical administration of justice they will be made to accommodate the exigencies of the particular facts, and under the circumstances of this case no better method of computing in money the injury suffered by the plaintiff by reason of the unlawful repudiation by defendant of its contract could be applied than to measure the value of the ore on hand and ready for delivery by the amount of a bona fide offer for it. This, with any other facts bearing directly upon the question of the value of the ore on hand at the time of the breach, were properly submitted to the jury for its consideration. We therefore think the learned court below correctly instructed the jury on this point when it said:

"The fixation of the damages is peculiarly the province of the jury in all cases, and should be so under the facts of this case. The proof is that the plaintiffs sought to sell during the December following the alleged breach; that they were unable to get a price exceeding $3.00 per ton. Having failed to sell, they brought suit, setting forth in their statement the value of the ore as $3.10 per ton, which they conceded, and claiming the difference of $1.75 per ton, being the difference between that sum and $4.85, the contract price. The evidence is uncontroverted that at no time from the alleged breach down to the date of the trial, could they have sold the ore at a higher

price than $3.10 per ton. As we have said, the fixation of the measure of damages in this case is peculiarly within the province of the jury. In no case, however, can you allow more than $1.75 per ton, as the plaintiff has so limited itself by its pleadings. Subject to such limitation, it will be for you, gentlemen of the jury, in case the plaintiff be entitled to damage by reason of the existence of a valid contract here and its breach by the defendant, to determine what the amount of such damage was, under the facts and conditions in evidence."

The slip apparently made by the court in telling the jury that they were the judges of the measure of damages, taken in connection with the other parts of the charge, is not worthy of notice, although it is made the subject of the twentieth assignment of error. It could not have injured the defendant, or misled the jury, and was evidently, if the court was correctly reported, a slip of the tongue that was unnoticed by counsel on either side. If it had been noticed, it would have been their duty to have called the court's attention to it.

A careful consideration of the record has convinced us that the case was properly submitted to the jury, and that the learned court below, in its charge, correctly and sufficiently stated the rules of law that should govern the jury in arriving at a verdict.

The judgment of the court below is therefore affirmed.