## DAVIS v. BROWN COUNTY COAL CO.

Where plaintiff contracted to sink a shaft 8'0 feet deep or to a vein of coal, defendant to furnish appliances, lumber, etc., and plaintiff was prevented from a full compliance with the contract by defendant's refusing to furnish additional lumber, and a suitable hoisting pump, and by ordering the work discontinued, plaintiff was entitled to recover the reasonable value of the labor performed..

Where each member of a corporation's board of directors knew of, and acquiesced in, an oral agreement made by the corporation's president with plaintiff for the continuance of mining operations in a certain shaft, the corporation was bound by the contract though it was not ratified by a formal resolution.

(Opinion filed, December 19, 1906.)

Appeal from Circuit Court, Brown County. Hon. J. H. Mc-Coy, Judge.

Action by Evan T. Davis against the Brown County Coal Company. From a judgment for plaintiff, defendant appeals. Affirmed.

*Taubman, Williamson & Herreid,* for appellant.

The power of directors belong to them collectively and not individually. The fact that a person is a director gives him no authority to act for the corporation except when acting as a member of the board, in the absence of a by-law conferring special authority upon him. 21 Am. & Eng. Ency. Law, p. 864, 2d Ed.; Des Moines M. & S. Co. v. Tilford M. Co. et al, 9 S. D. 542; Murray v. Lumber Co., 143 Mass. 250, 9 N. E. 634; 4 Thcmp. Corp., Sec. 4619, 4622, 4697; Lyndon Mill Co. v. Lyndon Literary & Biblical Inst., 22 Atl. 575; Cook Stock & Stockholders (3d Ed.), Sec. 716.

*I. O. Curtis* and *L. T. Van Slyck,* for respondent.

If the acts of a representative are accepted by the corporation or acquiesced in by it, they become binding. Huron Printing & Bindery Co. v. Kittleson, 4 S. D. 520, 57 N. W. 233; Taylor Gas Producing Co. v. Wood, 119 Federal, 966. No objection to a contract may tend to show ratification. 119 Federal, 593.

FULLER, P. J. During the year 1904, plaintiff and a number of men in his employ excavated a shaft for the corporate defendant, then engaged in prospecting for coal, and this action was instituted to recover $1,000 as the reasonable value of such labor and pursuant to an alleged oral agreement entered into by the par-

ties after the mutual abandonment of a written contract of a similar character under which plaintiff claims nothing. The issues raised by a denial of the execution of the oral agreement and an alleged failure on the part of plaintiff to perform the written contract were tried to a jury, and this appeal is from a judgment entered on a verdict in favor of plaintiff, and from an order overruling the defendant's motion for a new trial.

Under the written contract respondent undertook to sink and curb a shaft 7 by 11 feet to the depth of 80 feet, or to a coal bed, at the option of appellant. He was to have the free use of all the company's machinery and tools then upon the premises where the work was to be performed, and was to be provided with the lumber required for curbing the shaft, together with suitable board for the men and all necessary fuel for operating the machinery. At the time of making the written contract it appears that some work had been done upon this shaft, for the completion of which respondent was to receive $1,000, and, in the event it became necessary to abandon the same, he was to fill the excavation after removing all lumber and other materials which were to be used in the construction of another shaft for which appellant agreed to pay him $1,200. After respondent and the men in his employ had labored for considerably more than a month and had sunk the shaft about 35 feet a great mass of quicksand and water was encountered rendering it impossible to proceed with the work. He promptly reported this condition to appellant company at a meeting of its directors held on the 20th of October, 1904, at the office of its president, W. G. Wells, who appears to have been fully authorized to act for the corporation in all matters pertaining to the development work under consideration. At this meeting Mr. Wells and one of the directors, F. B. Gannon, were delegated to visit the mine with an expert on the following day for the purpose of determining what, if anything, could be done in sinking a smaller hole from the bottom of the abandoned shaft.

Concerning what was said and done thereafter plaintiff testified in part as follows: "Mr. Wells and Mr. Gannon visited the well the next day. They brought an expert with them. I am acquainted with W. G. Wells. Mr. Wells did all the corresponding

with me and managing the business. He done everything. Q. Whenever you had any matter involving this business to whom did you refer it? A. Mr. Wells. Mr. Wells has come down to the mine once or twice a week. Mr. W. G. Wells conducted the business management of the sinking of this shaft. Q. Did you, at this time, down at the mine, have any talk with W. G. Wells in regard to sinking a 4x5 hole down into the ground? A. Yes. Q. State to the jury what that conversation was. A. Mr. Wells told me if I would sink a shaft 4x5 down to the depth of 80 feet or dig the hole down to 80 feet, he would give me $500. He said if I would dig it down 80 feet or to coal he would give me $500. I said I could not do it under the conditions and under the loss I had already. He then said he would give me $600 if I would take it down, and, if I reached coal, he would give me $1,000. I said I would take it. He said he would furnish all the material that belonged to it. He said he would furnish all material, even board for the men and crew. I said I would accept the proposition under the conditions. I then went to work with 12 men besides myself and worked about three weeks on this 4x5 hole. During that time I had to have coal, lumber, food for the men, and such like. Q. Who furnished these things? A. Mr. W. G. Wells. Mr. Wells and Mr. McGlachlin were down there while I was working on this 4x5 hole. Mr. Gannon was not there. After I worked on this 4x5 hole 21 days I got within eight feel of the coal. At that time I required some more material or machinery, and went to the office of W. G. Wells at Aberdeen, S. D. I met Mr. Wells, Mr. Gannon, Mr. McGlachlin, and Mr. Suttle there. I demanded some lumber and told them I was in need of pumps. Q. What did these men say to you in regard to furnishing you with lumber and material? A. They said they did not want to furnish anything because the reason they did not know whether there was coal there or not. They said they wanted me to bore down and see whether there was coal there or not. They sent me to the hardware store for an auger. I went to a hardware store on Main street in Aberdeen, S. D. I do not know the name of the store. I could not get the auger and the hardware man telephoned to Mr. Wells. I got a three-inch auger from the hardware man at that time, and

went back to the mine and drilled down with the auger. This meeting it was held at the time they directed me to get the auger and go down with it to the coal. These men told me to notify them as soon as I struck coal. I bored down with the auger about eight feet and struck coal. I bored into it about three feet. I then went up to Mansfield and phoned Mr. Wells, and Mr. Wells and Mr. Gannon and two other men unknown to me came down. In the meantime, while they were coming down there, about 30 feet of water ran into the shaft. I did not have any talk with these men about gonig ahead. Q. Did you have any talk or did they say anything to you about what to do under the conditions? A. Mr. Wells spoke out that we better quit. 'What do you think, Mr. Davis?' and I says: 'I don't know.' They ordered some of the parties working with me to pull up the pump and machinery. Mr. Wells spoke out to me about abandoning it, and he said what I thought about it, and I says: 'I don't know.' I told them I struck coal and also struck a current of water. Mr. Wells said, 'How is the coal?' and some of my men answered him back and said that he would find the coal if he pumped the water out, 'and they would pump the water out. Before I commenced to sink this little three-inch hole I found coal. It was not float coal; just chunks of coal loose above the vein. It was not lignite; it was cannel. I was at the drill when I struck coal. The same quality of coal you have in your hand floated up. I was able and willing to sink this 4x5 shaft down to coal. I have had 30 years' experience before this time in sinking shafts, in Wales, Tennessee, Missouri, Montana, and North Dakota; and before this time I had, as a contractor, been engaged in putting down shafts for coal. I am acquainted with the value of services in sinking shafts. Q. At this first meeting that you testified to, at which time you made a report that it was impossible to complete that first shaft, was Hopkins there, and Gannon and Wells and McGlachlin? A. I could not say Mr. Hopkins was there. My best recollection is that Mr. Wells, Mr. Gannon, Mr. McGlachlin, and Mr. Suttle was there. That Mr. Wells or Mr. Gannon spoke up, they would go down there, and Mr. McGlachlin spoke out that the weather was not very favorable for him to go, and was not able to go, and said if Mr. Gannon and

Mr. Wells would go he would stay by their decision. What contracts that might be made they would stay by it. The rest said it was all right. · Mr. Wells and Mr. Gannon came down to the mine the following day. Q. That was the time you made the agreement with Mr. Wells in regard to putting down the 4x5 hole? A. Yes, sir. I did not do any work on this 4x5 hole until they came down. After I talked with Mr. Wells and he said he would give me $1,000 if I went down to coal, I went to work with a crew of men at the bottom of this abandonel shaft. I worked there about 20 days with 12 men. From the abandoned hole to where I quit was about 40 feet deep. During the time I was digging this hole Mr. W. G. Wells furnished the lumber and material and food for the men. Mr. Wells would be there once in two weeks or a week. He was there several times during the 21 days. Whenever I wanted any material or any goods or anything pertaining to this contract I applied to W. G. Wells. Q. Was there any other man representing this concern that you dealt with or asked anything that furnished you anything during all this time? A. I always went to W. G. Wells, and, if he was not present, Mr. McGlachlin or any one of the board would give them to me. * * * When I made this contract with this coal company Mr. Wells agreed to furnish me with the material he had there on the ground. He also agreed to furnish lumber and also board for the men. They agreed to furnish me such machinery as they had down there on the ground, all that was fit; the entire material we needed. During that time they agreed to furnish me machinery other than that upon the ground, the last time they were down there when the second contract was let. The second contract was made with Mr. Wells. Mr. Gannon was present at that time."

The foregoing testimony is fully corroborated in most particulars, and it is conceded that all the persons mentioned by respondent in his testimony were officers and directors of appellant company. Mr. Wells testified that, in making the oral contract in question he acted as the representative of the corporation. As the shaft was not sunk 80 feet nor to the vein of coal reached by the use of the auger, respondent very properly introduced testi- . .

mony under the second count of his complaint tending to show that $1,000 was the reasonable value of the labor performed, and that appellant prevented his full compliance with the agreement by refusing to furnish additional lumber and a suitable hoisting pump and by ordering the work to be discontinued. While the evidence pertaining to this branch of the case was conflicting and not entirely satisfactory, it was sufficient to sustain the jury in finding that appellant was obligated to furnish material and machinery in addition to what was on the ground when the oral contract was made, and that, by refusing to comply with its terms in that particular, respondent was unable to complete the shaft to the bottom of the auger hole where the vein of coal was encountered. It appears from respondent's testimony that, in addition to the material and machinery on the ground, appellant agreed to furnish all that was needed, and that he notified the managing officers that it was impossible to proceed with the work without additional lumber and a different hoisting pump, which they refused to provide and ordered the work to be discontinued. It was abundantly established by the evidence that respondent requested appellant's managing officers to provide him with a pump that would enable him to proceed with the work and that they always declined to do so, and, by the removal of the machinery then in use, rendered the completion of the shaft impossible. Under the allegations of the complaint, and such circumstances, respondent was entitled to recover the reasonable value of his services, which the jury found to be $648.37.

That the written contract was mutually abandoned and entirely superseded by the oral agreement stands proved by the undisputed evidence, and the authority of the officers to bind the corporation to the terms of the latter is the only question remaining for consideration. The claim of counsel for appellant that the corporation never empowered its board of directors to authorize Mr. Wells to make such agreement with respondent receives no support from the record. It was sufficiently shown that, when respondent made his report October 20, 1904, at a meeting of the corporation, and declared his inability to proceed with the large hoisting shaft on account of the quicksand and water encountered,

the subject received full consideration by the board of directors, and President Wells and Director Gannon were delegated to visit the mine on the following day to determine the advisability of sinking a hole from the bottom of such abandoned shaft. Entire satisfaction was expressed with this arrangement, and it was thereupon stated by all the directors that they would be governed by any agreement that these representatives might make with respondent pertaining to the further pursuit of the work. In support of the proposition that full knowledge of what had been done was brought home to the corporation, its director Gannon testified in appellant's behalf as follows: "When I came back to Aberdeen the first time I think I talked with the board of directors, or the balance of them. We told them what we had agreed to do. We told them that he agreed to go down in that way." The foregoing testimony, corroborated by abundant evidence deemed needless to quote, was ample to justify the jury in its conclusion that the transaction under consideration was authorized by appellant's board of directors, and that each member of such board knew of and acquiesced in the oral agreement under which respondent and his men performed the development work for which this action was instituted to recover judgment. Though the powers of a corporation are generally exercised by a board of directors, it may, without a formal resolution, delegate authority to one or more of its officers to enter into a binding contract with reference to a matter within the purpose of its creation. Moreover, the ratification of a contract not especially authorized may be implied by acquiescence, or from corporate acts without expressly accepting its terms. Huron Printing & Bindery Co. v. Kittleson, 4 S. D. 520, 57 N. W. 233; Salem Iron Co. v. Consol. Iron Mines, 112 Fed. 239, 50 C. C. A. 213.

As no errors of law occurred at the trial, either in the admission of evidence or in submitting the same to the jury, the reasons urged for a reversal are not sustainable, and the judgment appealed from is affirmed.

CORSON, J., not sitting.