Argued July 6, modified and affirmed November 21, 1922.

## BOARD OF SCHOOL TRUSTEES *v.* MORRISON.

(210 Pac. 448.)

**Schools and School Districts—Facts Held to Justify Dismissal of Case Against Trustee for Unlawfully Inducing Purchase of Land in Which He was Personally Interested.**

In an action against a school trustee for the restoration of money to a school fund alleged to have been unlawfully diverted by defendant taking advantage of his position as a trustee to induce the purchase of land in which he was personally interested, facts shown by evidence *held* to justify a decree dismissing the case.

From Multnomah: W. N. GATENS, Judge.

In Banc.

This is a suit brought by the board of school trustees, a corporation representing in substance the Episcopal Church of the Diocese of Oregon, against the defendant to compel the restoration to the fund of said corporation of a large sum of money which the complaint charges was unlawfully diverted therefrom and converted to the use of defendant. The complaint alleges in substance:

"That the plaintiff is a charitable corporation, consisting of seven members or trustees. Defendant was one of such trustees prior to 1906 and up to May 15th, 1915, and during the whole of that period controlled and dominated his associates, who relied upon his representations and readily and without question voted and granted his requests.

"That the plaintiff held in trust certain real and personal property, in accordance with the terms of the trusts imposed thereon, for the maintenance of a school for boys and for the benefit of the Protestant Episcopal Church of the Diocese of Oregon. In the year 1908, plaintiff, upon the suggestion of the defendant acting in his capacity as trustee of plaintiff, decided to acquire a tract of land containing about one hundred acres, near Portland, on which to erect a school for boys, pursuant to and in accordance with the directions and power given plaintiff under the aforesaid trust. Defendant, with the purpose and design of securing a secret and personal profit to himself by the use of the property and funds thus held in trust by the plaintiff, secured control of a tract of 1,015 acres, known as 'The Oak Hill Farm,' in Yamhill County, the purchase price of which to defendant was forty thousand dollars. Defendant concealed his interest in said tract of land from the plaintiff, or, rather, from his associates upon said board of trustees, and represented to them that a certain one hundred acres of the above-mentioned larger tract was of the value of twenty-five thousand dollars and in every way suitable for use in connection with said proposed school for boys. Defendant further persuaded his associates to adopt a resolution to purchase said one hundred acres of land and to borrow the sum of twenty-five thousand dollars on the real property held in trust by plaintiff, and to deliver said sum of twenty-five thousand dollars to him, with authority and direction to purchase said tract of one hundred acres for twenty-five thousand dollars and take title to the same in plaintiff. That upon receiving said sum of twenty-five thousand dollars from plaintiff, defendant completed the purchase of said larger tract of 1,015 acres and had the same conveyed to The Walnut Grove Company, a corporation controlled by him and organized by his direction. That of the twenty-five thousand dollars of the trust funds received by him as aforesaid, defendant first paid

twenty thousand dollars thereof upon the purchase price of said 1,015 acres and secured payment of the balance of said purchase price by a mortgage on the land, which mortgage was given by said Walnut Grove Company. That then defendant paid an additional sum of four thousand dollars upon said purchase price and secured the release from the mortgage of said 100-acre tract and caused the same to be conveyed to plaintiff. The remaining one thousand dollars defendant has ever since retained. That defendant kept and disposed of the remaining 915 acres of said tract of 1,015 acres, with large profit to himself, without accounting to plaintiff therefor.

"That the said 100-acre tract conveyed to plaintiff, including the improvements thereon, was not worth to exceed eight thousand dollars, thus leaving a balance of seventeen thousand dollars of the moneys entrusted to the defendant, together with the profits made by the defendant in the use thereof, unaccounted for.

"That thereafter, until May, 1915, defendant concealed from plaintiff all of the foregoing transactions and facts relating to his own interests and dealings with said property and led plaintiff to believe that he had paid the full sum of twenty-five thousand dollars for said one hundred acres of land conveyed to it as aforesaid, and defendant, for the purpose of enhancing the value of the remaining portion of the 1,015 acres in which he was interested, induced plaintiff to expend large sums, aggregating the sum of thirty thousand dollars, of the trust funds held by it in making improvements upon said land conveyed to it, which latter sum was an absolute loss to plaintiff and a wrongful diversion of said trust funds.

"That shortly prior to May, 1915, plaintiff for the first time discovered facts which placed it upon inquiry concerning the representations and transactions of defendant relating to said land and the disposition of said sum of twenty-five thousand dollars entrusted to him by plaintiff to purchase the land. At a meeting of the board of trustees of plaintiff in

May, 1915, defendant declined to answer questions addressed to him by the newly elected bishop of the diocese of Oregon concerning said matter, but 'did admit that plaintiff had not had a square deal in said transaction,. and stated that as soon as he could get his own affairs in shape he intended making restitution to the board,' and promised to make an effort to secure the aid of his associate, Morgan, in making such restitution. That this latter situation between plaintiff and defendant continued until sometime in 1918, when defendant disavowed and repudiated his said trust and refused to account or make restitution.''

The defendant answered with appropriate denials, and affirmative allegations sufficient to put the matters alleged in the complaint fully at issue. A reply to the new matter in the answer was filed. The cause was tried and a decree rendered in favor of defendant, from which plaintiff appeals. The pleadings if set forth in full would occupy about seventy pages of the reports and are therefore necessarily omitted.                          MODIFIED AND AFFIRMED.

For appellant there was a brief and oral arguments by *Mr. W. T. Slater* and *Mr. Charles E. Cochran.*

For respondent there was a brief over the name of *Messrs. Malarkey, Seabrook, & Dibble,* with an oral argument by *Mr. Dan J. Malarkey.*

McBRIDE, J.—At the outset it may help to clarify the situation to state in concrete form the fraudulent acts which plaintiff claims entitle it to recover. They are: First, that Dr. Morrison was one of the trustees of a fund devoted to the purpose of creating a grammar school for boys and a divinity school in the diocese of Oregon; second, that he took

advantage of his position as such trustee to inveigle his bishop and fellow-trustees into purchasing a site for such school at an exorbitant price, with a view to making a profit to himself out of the transaction. The means by which he is substantially charged with accomplishing this result are: (a) that he misrepresented the value of the property, thereby inducing the bishop and his fellow-trustees to pay $25,000 for property which he knew to be worth not more than $8,000; (b) that he concealed from them the fact that he had a large personal interest in the premises he was advising the board to buy, whereby the members thereof were led to believe that they were receiving the disinterested advice of a fellow-trustee, when in truth and in fact he was secretly driving an exorbitant bargain to the injury of the fund and to his own profit. To put the matter bluntly, it is charged in substance that the defendant made use of his position as a trustee and of his alleged pre-eminent influence with the bishop and his fellow-trustees to "graft" from the fund for his own benefit and to its fraudulent depletion. Omitting, for the reason before stated, the details set forth in the complaint, this is the gravamen of the charge, and, coming from the source from which it emanates, it is only fair to all parties to put aside mere technical disputations and examine the case upon its merits.

The property which constituted the original *corpus* of the fund which was used to purchase the realty which is the basis of this controversy was conveyed by the foundationers, the heirs of John H. Couch, to Rev. B. Wistar Morris as bishop of said diocese of Oregon in trust for the purposes mentioned in the deed, and Bishop Morris and Bishop Scadding as his successor were incapable of substituting other

trustees in their place in the management of the trust property save in advisory character, the members of the plaintiff board and their predecessors being mere trustees of the legal title of the property and subject to the control of the bishop as to its management and disposition. But, having elected to act as trustees generally, each person so acting owed to his bishop and his fellow-trustees every duty which the bishop owed to the trustors and the *cestui que trust;* and their position, being one largely advisory and confidential, coupled with their being the repositories of the legal title, demanded of each of them in his dealings with the bishop and with each other entire good faith and disinterested frankness in any act which he should perform or any counsel he should give in relation to the property or funds in the care of which he had voluntarily assumed to participate. So that, except perhaps as to the question of who has the right as a plaintiff to call the defendant for an alleged abuse of his position as a trustee, it makes no difference whether the ultimate power to manage or expend the fund lies with the bishop as trustee under the foundation or the gentlemen who have been invested with the apparent legal title and with the authority to act in at least an advisory capacity as to its disposition and care of the fund.

Before any of the transactions which form the basis of the present controversy had taken place there had been carried on in the City of Portland and under the auspices of this foundation a grammar school for boys known as the "Bishop Scott Academy," but this proved an unprofitable venture and was discontinued, so that in 1908 there was no Episcopal boys' school in Oregon, although it seems to

have been the desire and hope of Bishop Morris and the board of trustees to re-establish such school as soon as it should appear that the venture furnished a fair prospect of success.

The testimony indicates that Bishop Scadding, the successor of Bishop Morris, was especially anxious for the reopening of the school and that in these matters the board of trustees, plaintiff here, was disposed to defer to his wishes, and indeed it is difficult to see how its members could have done otherwise, as the original grant from the creators of the trust was to Bishop Morris and his successors in office, a specific trust in relation to which neither said bishop nor his successors could so act as to deprive themselves of the ultimate right of disposition and management. The idea of Bishop Scadding seems to have been to secure a suitable location for the school somewhere in the country remote from those temptations and distractions which a location in or near the city would naturally present to boys away from home influences. With this in mind the bishop and his trustees began casting about for a suitable site. One near Rainier and another in southern Oregon were suggested or offered, but for some reason not disclosed were not found acceptable.

It is here that defendant's connection with the transactions which are the subject of the present suit begins. In 1908 Mr. Bland Hering was the owner of a farm known as the "Charles Ladd Farm" or "Oak Hill Farm," in Yamhill County. It had previously been owned by Mr. Charles Ladd, a wealthy member of a prominent Portland family, and had been one of the show places of the county. Ladd, who had devoted his attention largely to raising blooded stock, had built upon the tract extensive

barns, an electric plant and useful outbuildings. He had erected a handsome and commodious country home containing fourteen rooms. The house was equipped with electric lights, hot and cold water, baths and the usual conveniences of a city home; there was a well-kept lawn adorned with flowers and shrubs; and the premises included a small orchard of the usual fruits and about twelve acres planted to walnuts which apparently promised good results. These improvements were in about the center of the tract, in a fine, sightly location, and on the hundred acres afterward sold to the plaintiff's predecessors. In point of scenic beauty it is doubtful if a superior location could have been found in the state, and the buildings then upon the place probably seemed sufficient with slight alterations and additions for the nucleus of the proposed school.

So far, then, we have an ideal location and situation for the proposed school, if such an institution were in other respects desirable.

The sale to the board was brought about under the following circumstances: The whole tract embraced in Oak Hill or Ladd Farm and owned by Mr. Hering comprised in all 1,015 acres, of which about 500 acres were covered with scrub-oak. The 100 acres purchased by the board were apparently the very heart of the tract both in regard to beauty and richness and variety of soil; and, as before stated, they contained all the valuable improvements. The board was not in the market for a farm as such, but for a tract for a school for boys and incidentally desired some arable land upon which the students could practice gardening, fruit cultivation and matters of that kind.

It does not appear from the testimony that the defendant unduly urged this purchase upon the board. It came about in this way: In 1908 W. B. Streeter had an option from Hering, the owner, to purchase the farm at a price of $40,000. Associated with him later was E. M. Morgan, and these parties principally through Morgan solicited the defendant to become interested with them in the purchase of the farm with a view of subdividing it into small tracts for the cultivation of walnuts and other farm products. At that time there prevailed a general opinion amounting almost to a craze as to the enormous profits that could be realized from the planting and cultivation of nuts, and the defendant, who evidently knew more about the Scriptures that he did about walnut culture, became an easy victim to the walnut mania and after a visit to the property consented to become interested with Streeter and Morgan in the proposed purchase. At a later visit it occurred to him that the 100 acres subsequently purchased by the board would constitute an ideal site for the proposed school, and he suggested to Streeter and Morgan that they make a reasonable proposition to the board for the sale of the tract. Defendant had not at this time any actual financial interest in the option controlled by Streeter and Morgan, but there was an understanding that he would contribute some money to the project and take some interest in the ultimate purchase of the land. The defendant states, and he is corroborated by Streeter, who is a fair witness, that he informed Streeter and Morgan that he, the defendant, owing to the fact that he was a member of the board of trustees, would not be a party to recommending the purchase or persuading the board to engage in it, but that they must deal with the

board on their own behalf and show the property and do their own bargaining. Streeter does not recall that defendant said this to him personally, but does remember that Morgan informed him that this was defendant's attitude and asked him to talk to defendant, probably with a view to inducing him to urge actively the purchase, upon the board.

There is nothing to indicate that the defendant ever at any time urged the board to purchase the property, or did anything to induce the deal beyond the fact of calling attention of the bishop and members of the board to the eligibility of the site, which was visited by a committee of the board and the bishop himself and was found satisfactory. Viewed from the standpoint of 1908 instead of 1921, and considering the purposes for which it was intended, the purchase at the price paid was not exorbitant, and it is doubtful that another site so suitable could have been purchased for the same money. There was no concealment by the defendant of the fact that he had a present or prospective interest in the property; the bishop knew it and the members of the board, except Mr. Ganong, who was absent, knew it. It is true that defendant did not state in detail the exact nature of his interest; in fact, it is doubtful if that had been fully settled between himself and Streeter and Morgan. But that he had a present or prospective interest was well known. This being the case, the bishop and the board were thereafter dealing with the corporation of which he was a member at arm's-length, and in our opinion made a better bargain with his corporation than they could have made with the original owner. Streeter testifies that he tried to induce Hering to sell the 100 acres to the board independently of the rest of the tract,

but that Hering refused. He evidently was of the opinion that the remainder of the farm with this 100 acres cut from the center was not worth $15,000. The mistake that Bishop Scadding made and that the board made was in purchasing any site whatever for a school for boys, and to this initial mistake it is not shown that the defendant contributed; indeed, he states that he opposed it although it finally became the fixed policy of the diocese. That an Episcopal grammar school for boys could not receive adequate support in the City of Portland had been demonstrated by the fact that the Bishop Scott Academy had run the fund in debt to the extent of $75,000 and had then been closed for lack of support. That such a school would be, more successful if located in the country surrounded by beautiful orchards and umbrageous oaks, was a roseate speculation which perhaps should never have been engaged in. Like the large profits that so many in 1908 supposed could be reaped from fruit and walnut culture, the school scheme looked promising on paper but was a dismal failure in practice. The truth is, that Streeter and Dr. Morrison were both deceived and misled by Morgan. Streeter with better business judgment than Dr. Morrison and with better information as to Morgan's real character, wisely withdrew from the syndicate, with the result that Morgan, abusing the confidence of defendant, shouldered the bulk of the burden upon his remaining associate, who, in our judgment, honestly sought to carry out the remaining part of the contract, but by trusting the details to Morgan, failed to do so. The remedy for such failure, if any now exists, rests in the law courts. Dr. Morrison's connection with the walnut grove company was absolutely known to the board both as

a matter of law and of fact on August 29, 1908, when the deed to the 100-acre tract was delivered to it, and was known in January, 1912, when the board of trustees passed a resolution releasing the walnut grove company from its obligation to plant trees on other parts of the tract, and agreed to accept Dr. Morrison's personal promise to carry out this part of the agreement. Ten years have passed since then. The school experiment has proved a failure, not because the land was unfruitful or had been in anywise misrepresented, not because of any failure to plant additional walnut trees, but because the membership of the diocese was not sufficient to support such a school.

A new bishop came here, found the school abandoned and the place unkempt, looking like a widow's farm, and, not being familiar with conditions at the time the purchase was made, perhaps not unnaturally was inclined to take a prejudiced view of the situation and to begin his investigation rather as a prosecutor than an unbiased searcher for facts. We attribute to him no improper or personal motives, but cannot divest ourselves of the idea that could he have had the information that his venerable and beloved predecessor could, if living, have imparted, this suit would not have been instituted.

We are of the opinion that when this tract was purchased the board got what it believed and Dr. Morrison believed was the full worth of the money paid, and that he sufficiently disclosed to the board the fact that he had an interest in the property which was being sold. If he did this, the board had no reason to complain: 14 C. J., § 1887; Cook on Corporations, § 652; *Jameson* v. *Coldwell*, 23 Or. 144 (31 Pac. 279); *Stanley* v. *Luse*, 36 Or. 25 (58 Pac. 75); *Gam-*

*ble* v. *Queen's County Water Co.,* 123 N. Y. 91 (25 N. E. 201, 9 L. R. A. 527); *Barr* v. *Pittsburgh Plate Glass Co.,* 57 Fed. 86 (6 C. C. A. 260); *Figge* v. *Bergenthal,* 130 Wis. 594 (109 N. W. 581, 110 N. W. 798); *Stetson* v. *Northern Inv. Co.,* 104 Iowa, 393 (73 N. W. 869); *Battelle* v. *Northwestern Cement Co.,* 37 Minn. 89 (33 N. W. 327); *Louisville N. A. & C. Ry. Co.* v. *Carson,* 151 Ill. 444 (38 N. E. 140); *Salem Iron Co.* v. *Lake Superior Mines,* 112 Fed. 239 (50 C. C. A. 213); *Porter* v. *Lassen County Co.,* 127 Cal. 261 (59 Pac. 563).

We have not seriously considered the technical defense of laches or the statute of limitations. Whatever may be the merits of these, they become unimportant in view of the fact that in our opinion there is no virtue in the contention that the defendant used his position as a trustee or minister of his church to obtain an advantage over the board in the transactions referred to. It was unfortunate that through reliance upon a dishonest associate he has not carried out his subsidiary agreement to plant and cultivate additional acreage upon the grounds in question, although it is now doubtful whether or not such cultivation would have been of material advantage to the plaintiff. His expressed willingness to do this has been twisted into an admission of wrongdoing and fraud, a construction which we are satisfied was entirely foreign to his thoughts.

This has been a long case, the transcript of testimony alone covering several thousand pages of typewriting, which the writer has carefully read three times and endeavored to absorb. That it has been conducted with an acrimony which seems even to have extended itself to counsel on both sides is a matter of regret. While not agreeing with the Cir-

cuit Court in all of its findings, we are of the opinion that the facts fully justify the decree dismissing the case; but as it appears that either through fault or misfortune the defendant has not fully performed his agreement to plant additional acreage, we do not feel inclined to allow him costs in this proceeding. The decree of the Circuit Court is affirmed, with the modification that neither party recover costs in either court.                    MODIFIED AND AFFIRMED.

McCOURT, J., took no part in the hearing or consideration of this state.